**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Patricia Campbell HEARST, Defendant-Appellant.**

**Nos. 76–3162, 77–1759.**

United States Court of Appeals, Ninth Circuit.

Nov. 2, 1977.

Rehearing En Banc Denied Jan. 4, 1978.

F. Lee Bailey and J. Albert Johnson, Boston, Mass., argued for defendant-appellant.

James L. Browning, Jr., U. S. Atty., San Francisco, Cal., argued for plaintiff-appellee.

Before BROWNING, TRASK and WALLACE, Circuit Judges.

PER CURIAM:

Appellant was tried under a two-count indictment charging her with armed robbery of a San Francisco bank in violation of 18 U.S.C. §§ 2113(a), (d) and 924(c)(1). The government introduced photographs and testimony descriptive of appellant's role in the robbery. Appellant raised the defense of duress, contending her co-participants compelled her to engage in the criminal activity. The jury found appellant guilty. The district court sentenced her to seven years in prison on one count and two years on the other, the sentences to be served concurrently.

Appellant argues that the trial judge erred in admitting and excluding evidence and in ruling on appellant's privilege against self-incrimination. No novel issues are presented. We conclude on the basis of well established principles that no reversible error occurred and that the judgment must be affirmed.

### I. *Evidence of Subsequent Crimes*

During its case-in-chief the government introduced evidence connecting appellant with criminal activity at a sporting goods store and with a kidnapping and theft. These incidents occurred in the Los Angeles area approximately one month after the San Francisco bank robbery. The evidence showed that appellant accompanied William and Emily Harris to Mel's Sporting Goods Store in Los Angeles, that the Harrises entered the store and left appellant outside in a truck, that a store clerk saw William Harris shoplifting and attempted to arrest him, and that appellant discharged an automatic rifle at the store, enabling Harris to escape. The evidence further showed that on the same day appellant and the Harrises stole a van and kidnapped its owner, Thomas Matthews. Matthews testified that during this incident the Harrises were outside

the van and appellant had an opportunity to escape or give Matthews a message but did not do so.

Appellant objects to admission of this evidence on three grounds. She asserts the evidence was irrelevant for any purpose except the improper one of convincing the jury that appellant acted in accordance with a criminal disposition. She argues that even if the evidence were relevant to the issue of intent, as the district court held, the incidents were so dissimilar to the bank robbery that its probative value was minimal and outweighed by its prejudicial effect. Finally, appellant contends the court erred in permitting the introduction of this evidence during the government's case-in-chief.

■ Evidence of other criminal acts may be persuasive that the accused is by propensity a probable perpetrator of the crime charged. Nonetheless, it is excluded when offered for this purpose because it may unduly influence the jury and deny the accused a fair opportunity to defend against the particular charge. *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

■ Evidence of other criminal acts may be admitted for purposes other than proving criminal predisposition, however. It may be received, for example, to prove knowledge, motive, and intent. Fed.R. Evid. 404(b). *Accord, United States v. Rocha,* 553 F.2d 615, 616 (9th Cir. 1977); *United States v. Burns,* 529 F.2d 114, 118 (9th Cir. 1976); *United States v. Marshall,* 526 F.2d 1349, 1360 (9th Cir. 1975). The government contends that the evidence of appellant's criminal acts in Los Angeles a month after the bank robbery was relevant to the issue of appellant's intent when she participated in the San Francisco bank robbery, and to whether appellant was acting under duress.[1]

---

1. A defendant who, without opportunity to escape, has a well grounded fear of imminent death or serious injury unless he complies with his captor's wrongful commands entertains a mental state recognized as exculpatory with respect to most crimes. Compulsion or duress producing this state of mind is a defense to most criminal accusations. *See United States v. McClain,* 531 F.2d 431, 438 (9th Cir. 1976); *United States v. Gordon,* 526 F.2d 406, 407 (9th Cir. 1975); *United States v. Palmer,* 458 F.2d

■ Appellant raised the defense of duress at trial and offered substantial evidence to support it. To convict appellant, therefore, the government was required to show appellant was not acting under duress when she participated in the San Francisco robbery.[2] The evidence of appellant's involvement in the Los Angeles activity was relevant to this issue because it tended to show appellant willingly engaged in other criminal activity with persons of the same group at a time not unduly remote.

■ Appellant correctly points out that though relevant, evidence of other criminal conduct by the accused should be excluded if its probative value is outweighed by its prejudicial impact upon the accused. Fed. R.Evid. 403. *Accord, United States v. Satterfield*, 548 F.2d 1341, 1346 (9th Cir. 1977); *United States v. Grammer*, 513 F.2d 673, 677 (9th Cir. 1975); *Fernandez v. United States*, 329 F.2d 899, 908 (9th Cir. 1964). This determination is largely a matter for the discretion of the district court. *United States v. Rocha, supra; United States v. Riggins*, 539 F.2d 682, 683 (9th Cir. 1976);

*United States v. Nichols*, 534 F.2d 202, 204 (9th Cir. 1976). Appellant challenges the discretionary determination made by the district court in this instance.

■ Appellant points out that the Los Angeles offenses were not similar to the San Francisco robbery with which she was charged. Because the events were so dissimilar, she contends, they offer little insight into her state of mind during the robbery. But to justify admission of evidence of other crimes, the crimes must be "similar" to the offense charged only if it is the similarity of the crimes that underlies the relevance of the evidence. *United States v. Riggins, supra*, 539 F.2d at 683.[3] Here the relevance of the evidence did not depend on the similarity of the Los Angeles crimes to the bank robbery but on the circumstances surrounding the occurrence of the Los Angeles crimes, which indicated appellant had not acted under duress when she participated in the bank robbery. The tendency of the evidence regarding the Los Angeles crimes to prove appellant was not

663, 665 (9th Cir. 1972); *D'Aquino v. United States*, 192 F.2d 338, 357–59 (9th Cir. 1951).

**2.** We indulge in the assumption that every defendant is sane, and it is not incumbent upon the prosecution to prove sanity until the defense presents evidence to the contrary. "But once substantial evidence of insanity is received in evidence, the presumption of sanity disappears. The burden is then placed upon the prosecution to prove legal sanity beyond a reasonable doubt, as in the case of any essential element of the crime charged." *Hartford v. United States*, 362 F.2d 63, 64 (9th Cir. 1966). *See also United States v. Segna*, 555 F.2d 226, 229 (9th Cir. 1977); *United States v. Hartfield*, 513 F.2d 254, 259 (9th Cir. 1975).

The same considerations apply to the even rarer defense of duress. It is assumed that every defendant's actions were free from duress, absent evidence to the contrary. As was said in the English case of *Regina v. Gill*, [1963] 1 W.L.R. 841, 846 (Crim.App.):

The accused, either by the cross-examination of the prosecution witnesses or by evidence called on his behalf, or by a combination of the two, must place before the court such material as makes duress a live issue fit and proper to be left to the jury. But, once he has succeeded in doing this, it is then for the Crown to destroy that defence in such a manner as to leave in the jury's minds no reasonable doubt that the accused cannot be

absolved on the grounds of the alleged compulsion.

*See United States v. Johnson*, 516 F.2d 209, 212–13 (8th Cir. 1975). *See also* Model Penal Code § 2.09, Comment at 8–9 (Tent. Draft No. 10, 1960); *id.* § 1.13(2), Comment at 110–12 (Tent. Draft No. 4, 1955).

**3.** *United States v. Riggins*, 539 F.2d 682, 683 (1976):

A trial court is called upon to exercise its discretion in determining whether proffered evidence of other crimes or misconduct has probative value sufficient to outweigh its potential for prejudice to the defendant. Federal Rule of Evidence 404(b), Advisory Committee Note; *see* Federal Rule of Evidence 403. The Rule embodies an " 'inclusionary' rule which admits all evidence of other crimes relevant to an issue in a trial, except that which tends to prove *only* criminal disposition." 2 Weinstein's Federal Evidence ¶ 404[08] (1975) (emphasis added). The other crimes disclosed by the proffered evidence must be "similar," to the offense charged *if* similarity of the crimes is the basis for the relevance of the evidence. But relevance is the essential criterion. Relevant evidence is not to be excluded because it fails to meet a similarity requirement. *Cf. United States v. Jones*, 425 F.2d 1048, 1051–52 (9th Cir. 1970).

coerced when she participated in the San Francisco robbery is not diminished by the lack of similarity between the Los Angeles and San Francisco offenses.

Appellant also argues that the sequence of the San Francisco and Los Angeles events undermines the relevance of the latter to her state of mind during the San Francisco robbery. Absence of duress in the later Los Angeles incidents would not be probative of her state of mind during the San Francisco robbery, she contends, because the robbery itself made her an outlaw and a fugitive. This fact may have caused her to participate willingly in the Los Angeles events, she asserts, even if she were under duress during the earlier robbery.

Appellant's hypothesis does bear upon the probative value of the evidence, and it is an appropriate consideration in determining whether on balance the evidence should have been admitted. It is, however, only a hypothesis, and a highly speculative one. The mere assertion of this hypothesis does not so undermine the probative worth of the evidence of the Los Angeles incidents in establishing appellant's state of mind during the San Francisco robbery as to render admission of the evidence an abuse of discretion. The jury could well reject appellant's theory and conclude that if appellant had been forced to participate in the bank robbery against her will she would have refrained from criminal activity in Los Angeles or seized the opportunity to escape.

The trial judge was called upon to balance the need for the evidence in the search for the truth against the possibility that the jury would be prejudiced against appellant because the evidence revealed she had participated in other conduct that was criminal. The district court acted well within its discretion in admitting the evidence. Appellant's state of mind during the San Francisco robbery was the central issue in the case. State of mind is usually difficult to prove, and the evidence on the issue was sharply divided. The timing and other circumstances of the Los Angeles incidents made evidence of them highly probative on this critical issue. Though criminal, the incidents were not of a kind likely to inflame the jury. The prejudice to appellant arose primarily from the light the evidence cast on appellant's state of mind during the San Francisco robbery and not from the incidental circumstance that it revealed appellant's involvement in other criminal acts.

■ Appellant contends that even if evidence of the Los Angeles incidents were admissible, the district court erred in admitting it in the government's case-in-chief. The argument runs as follows. Bank robbery is a crime requiring a general rather than specific intent, *United States v. Hartfield,* 513 F.2d 254, 259 (9th Cir. 1975), and the jury could infer the requisite intent from the commission of the act. *United States v. Porter,* 431 F.2d 7, 10 (9th Cir. 1970). Since evidence of other criminal acts was not required to enable the government to carry its burden of proving intent, it should not have been admitted as part of the government's case-in-chief. *United States v. Adderly,* 529 F.2d 1178, 1181 n. 1 (5th Cir. 1976), *quoting Fallen v. United States,* 220 F.2d 946, 948 (5th Cir. 1955); *United States v. Ring,* 513 F.2d 1001, 1007–09 (6th Cir. 1975). It was reversible error, appellant concludes, to admit to such prejudicial evidence when its only relevance was to rebut a defense of duress not yet raised. *See United States v. Ring, supra; United States v. Fierson,* 419 F.2d 1020, 1023 (7th Cir. 1969).

The government concedes it cannot present evidence that the accused committed other crimes to prove a point not in issue. The government argues, however, it was clear that appellant would raise the defense of duress, and whether the government was to be allowed to introduce the evidence in its opening presentation or only in rebuttal was merely a question of the order in which the parties should adduce their proof at trial, a matter within the trial court's discretion. *See Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); Fed.R.Evid. 611(a); 2 J. Wigmore, Evidence § 307 at 207 (3d ed. 1940).

We are satisfied that admission of the evidence in the government's case-in-chief does not dictate reversal in this case. It is unnecessary to decide whether the trial court's ruling was within its discretion. The ruling, if error, was nonetheless harmless.

Even before trial commenced it was appellant's announced intention to defend on the ground of duress.[4] No other defense was available to her. If appellant defended at all, the evidence of the Los Angeles events would have been placed before the jury in the government's rebuttal. There is no basis for assuming appellant was prejudiced because the evidence was admitted in the government's case-in-chief rather than in rebuttal. The prejudice arose from the substance of the evidence, not from the timing of its introduction.

## II. *Privilege against Self-Incrimination*

During the trial appellant elected to testify in her own behalf. She described in exhaustive detail the events immediately following her kidnapping of February 4, 1974. These included physical and sexual abuses by members of the Symbionese Liberation Army (SLA), extensive interrogations, forced tape recordings and written communications designed to convince her family that she had become a revolutionary, and training in guerrilla welfare. She next described how the SLA compelled her under threat of death to participate in the robbery of the Hibernia Bank on April 15, 1974, and to identify herself by reading a revolutionary speech. She explained that by the time the group moved to Los Angeles, the SLA had convinced her that they would kill her

if she tried to escape and that the Federal Bureau of Investigation also desired to murder her. Appellant added that the SLA required her to make various post-robbery admissions about her voluntary role in the crime.

Appellant's story continued by describing her participation one month after the robbery in the disturbance at Mel's Sporting Goods Store. She claimed that her reaction in firing at the store resulted from fear of the SLA, as did her admission to Thomas Matthews of complicity in the bank robbery. She then told how she, the Harrises, and Jack Scott traveled from Los Angeles to Berkeley, then to New York, to Pennsylvania, and finally to Las Vegas in September of 1974. Again, she emphasized that she was an unwilling companion of the group. After mentioning her arrival in Las Vegas, her testimony jumped a year to the time of her arrest in San Francisco on September 18, 1975.

On cross-examination, appellant refused to answer most questions concerning the period between her arrival in Las Vegas and her arrest in San Francisco.[5] In response to questions about her activities, residences, and association with other suspected members of the SLA during this year, she invoked the Fifth Amendment privilege against self-incrimination 42 times.

Prior to government questioning, appellant had moved for an order limiting the scope of the cross-examination so as to avoid the necessity of invoking the Fifth Amendment in response to questions implicating her in other crimes for which she

---

4. Weeks prior to trial the defense responded to a motion of the government under Fed.R. Crim.P. 12.2 (Notice of Defense Based upon Mental Condition) with this statement:

 At the first level of defense, and the only defense to the charge which is going on in trial, is physical coercion and threats of fear and death. That would be the defense to the robbery of the Hibernia bank.

 . . . . .

 The defense on the merits is the simple defense that "somebody put a gun at my head and I did what they told me." That is all.

5. Appellant did answer some of the government's questions about her activities during this period, but she refused to answer questions which she or her counsel perceived as incriminating. Thus, she answered questions about the membership of James Kilgore, Stephen Soliah, and Cathleen Soliah in a subversive organization, the New World Liberation Front. R.T. 1826–27. However, she refused to discuss her relationship with these individuals. She also discussed her August 12, 1975 visit to a dermatologist. R.T. 1827–29.

was not on trial. Finding that appellant had waived her privilege against self-incrimination as to all relevant matters by testifying in her own behalf, the court denied this motion and allowed the government to ask her questions which resulted in her assertion of the Fifth Amendment. *United States v. Hearst,* 412 F.Supp. 885 (N.D.Cal.1976). Appellant now offers five separate grounds for finding that the court committed reversible error in making this ruling.

■ 1. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." But it is also true, as the trial court stressed, that a defendant who testifies in his own behalf waives his privilege against self-incrimination with respect to the relevant matters covered by his direct testimony and subjects himself to cross-examination by the government. *Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). Appellant contends that she "did not voluntarily waive her Fifth Amendment privilege by testifying because her testimony was compelled by the introduction of certain evidence, i. e., post-crime conduct, which was challenged as inadmissible and highly prejudicial." Reply Brief for Appellant at 7. She pleads that she was caught between the "rock and the whirlpool" when forced to decide whether to testify or allow the evidence to stand unrebutted.

■ The validity of this argument depends largely on appellant's assumption that evidence of her post-robbery behavior was admitted erroneously, and that she had no choice but to respond to this inadmissible evidence. We have concluded previously, however, that the trial court determined correctly that this evidence was relevant and admissible. Thus, appellant's attempt to compare her situation to that involved in *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), where the defendant had to testify in order to overcome the impact of prior confessions which had been illegally obtained and introduced, is unconvincing. In the present case,

neither the trial court nor we found that any illegal, inadmissible evidence forced appellant to testify.

Appellant also suggests it is sufficient that she *thought* she was being compelled to testify in response to the admission of evidence which she *perceived* as prejudicial, inadmissible, and damaging to her defense. We refuse to hold that a defendant's subjective impressions of what he is "forced" to do during his trial are enough to render his testimony involuntary. A defendant often will view evidence as incriminating and inadmissible, and feel that he must take the witness stand in order to save his case. This is an inherent feature of our criminal justice system, however:

> The defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction. When he presents his witnesses, he must reveal their identity and submit them to cross-examination which in itself may prove incriminating or which may furnish the State with leads to incriminating rebuttal evidence. That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.

*Williams v. Florida,* 399 U.S. 78, 83–84, 90 S.Ct. 1893, 1897, 26 L.Ed.2d 446 (1970). In *Williams,* the Supreme Court found that the defendant had a free choice between giving notice of his alibi defense, as required by a Florida statute, and refraining from presenting this defense. Similarly, in our case, we find that appellant freely elected to testify in her own behalf.

■ 2. Appellant also argues that she did not waive her privilege against self-incrimination because her testimony was limited to the collateral issue of the voluntariness of certain statements (i. e., the admissions of willing participation in the bank robbery) made by her and introduced into evidence over her objection. She contends that since her testimony did not address the merits of the case, the government should

not have been allowed to ask questions which attempted to prove her guilt. She refers us to *Calloway v. Wainwright,* 409 F.2d 59, 66 (5th Cir.), *cert. denied,* 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969), which stated: "[t]hat appellant took the stand for the sole purpose of testifying upon the credibility of the voluntariness of his [earlier] confession should not be taken as a complete waiver of his constitutional privilege against self-incrimination."

Appellant's assumption about the nature of her testimony is completely erroneous. The central theme of her lengthy testimony was that from the moment of her kidnapping to the time of her arrest she was an unwilling victim of the SLA who acted under continual threats of death. She tried to show, not merely that she made her admissions involuntarily, but that she acted under duress in robbing the Hibernia Bank, firing at the sporting goods store, and traveling with the Harrises for over one year. She disputed the main element of the government's case: that she had the necessary criminal intent when she participated in the bank robbery. Thus, her reliance on *Calloway* is misplaced, for that case dealt with the much narrower situation in which a defendant takes the witness stand solely to deny the voluntariness of his confession. *Calloway v. Wainwright, supra,* 409 F.2d at 66.

3. Appellant next claims that even if she did waive her privilege against self-incrimination by testifying in her own behalf, the waiver did not extend to the period between her arrival in Las Vegas and her arrest in San Francisco. She argues that since she did not testify concerning her activities during this "lost year," the government had no right or reason to ask any questions about it. She would confine the proper scope of cross-examination to the events which she specifically discussed during her direct testimony.

We find that appellant misinterprets the controlling case law on waiver and the permissible limits of the cross-examination of a testifying defendant. The Supreme Court has stated that when a defendant takes the witness stand, "his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination." *Brown v. United States, supra,* 356 U.S. at 154–55, 78 S.Ct. at 626. "[A] defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination." *McGautha v. California,* 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971). This rule is premised on basic goals of fairness and ascertainment of the truth:

The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute.

*Brown v. United States, supra,* 356 U.S. at 155–56, 78 S.Ct. at 627. Nowhere in this rule is there even a suggestion that the waiver and the permissible cross-examination are to be determined by what the defendant actually discussed during his direct testimony. Rather, the focus is on whether the government's questions are "reasonably related" to the subjects covered by the defendant's testimony.

Applying this principle to the present case, we conclude that the trial court did not abuse its broad discretion, *United States v. Higginbotham,* 539 F.2d 17, 24 (9th Cir. 1976), in allowing the government to ask questions about the year which appellant failed to cover in her direct testimony. As we have already concluded, appellant's testimony was not limited to disputing the voluntariness of her post-robbery admissions. Instead, she attempted to show that from her kidnapping until her arrest

she acted exactly as her captors directed.[6] She tried to persuade the jury that her post-robbery conduct and feelings of fear, dependence, and obedience proved that she had also acted involuntarily and without criminal intent in robbing the Hibernia Bank.

We agree with the trial court's conclusion that appellant's testimony placed in issue her behavior during the entire period from abduction to arrest, and gave the government a right to question her about the "lost year." *See United States v. Hearst, supra,* 412 F.Supp. at 887. Although appellant did not discuss this year, the natural inference from her other testimony, if believed, was that she had acted involuntarily during this period. Having offered selective evidence of the nature of her behavior for the whole period, appellant had no valid objection to the government's attempt to show that her conduct during the omitted year belied her story and proved that she was a willing member of the SLA. Since appellant's direct testimony raised an issue about the nature of her conduct during the entire one and one-half years prior to her arrest, the government's questions about her activities, associations, and residences during the interim year were more than "reasonably related" to the subject matter of her prior testimony. That answers to these questions might have implicated appellant in crimes for which she was not on trial had no bearing on the questions' relevancy or relationship to her direct testimony.

4. Appellant argues that even if she had no right to refuse to answer the government's questions, the court erred in allowing the prosecution to continue to ask questions which it knew would elicit repeated assertions of the privilege against self-incrimination. We find that appellant's authorities do not support her proposition. Her cases involve situations in which the government or the defendant questioned a witness or a co-defendant, knowing that a valid, unwaived Fifth Amendment privilege would be asserted. *E. g., United States v. Roberts,* 503 F.2d 598 (9th Cir. 1974), *cert. denied,* 419 U.S. 1113, 95 S.Ct. 791, 42 L.Ed.2d 811 (1975); *United States v. Beye,* 445 F.2d 1037 (9th Cir. 1971); *Sanders v. United States,* 373 F.2d 735 (9th Cir. 1967). She fails to offer support relating to the very different problem, present in our case, in which the government attempts to cross-examine a witness-defendant who has previously waived his privilege against self-incrimination.

In determining whether it is improper for the government to ask a defendant questions which will result in an assertion of the privilege against self-incrimination, the central consideration is whether the defendant has waived his privilege as to the propounded questions. When a witness or a defendant has a valid Fifth Amendment privilege, government questions designed to elicit this privilege present to the jury information that is misleading, irrelevant to the issue of the witness's or the defendant's credibility, and not subject to examination by defense counsel. *See Namet v. United States,* 373 U.S. 179, 186–87, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). Therefore, we do not allow this form of questioning.

But when a defendant has voluntarily waived his Fifth Amendment privilege by testifying in his own behalf, the rationale for prohibiting privilege-invoking queries on cross-examination does not apply. The defendant has chosen to make an issue of his credibility; he has elected to take his case to the jury in the most direct fashion. The government, accordingly, has a right to challenge the defendant's story on cross-examination. *Brown v. United States, supra,* 356 U.S. at 154–56, 78 S.Ct. 622. The

---

**6.** Appellant's counsel, Mr. Bailey, indicated very directly his desire to show that appellant had been threatened, abused, and coerced by the SLA for almost two years. When he sought to gain admission into evidence of a portion of her testimony, he stated: "She has been threatened by them [the Harrises] for two years, Your Honor." R.T. 1416. He termed her testimony "a rebuttal to the notion that Mr. Browning [the United States Attorney] wishes to sell this jury that she had no actual fear of the Harrises." R.T. 1418.

government may impeach the defendant by developing inconsistencies in his testimony; the government may also successfully impeach him by asking questions which he refuses to answer. If the refusals could not be put before the jury, the defendant would have the unusual and grossly unfair ability to insulate himself from challenges merely by declining to answer embarrassing questions. He alone could control the presentation of evidence to the jury.

Our view finds support in decisions construing the propriety of judicial and prosecutorial comment upon a defendant's refusal to testify. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), held that neither the government nor the court may comment on an accused's exercise of his Fifth Amendment privilege by refusing to testify. But it has long been established that comment is allowed when a defendant fails to explain evidence against him after first waiving his privilege by taking the witness stand. *Caminetti v. United States*, 242 U.S. 470, 492–95, 37 S.Ct. 192, 61 L.Ed. 442 (1917).[7] Since the offering of questions designed to elicit invocations of the Fifth Amendment is really only a form of comment upon the defendant's failure to testify, intended to present to the jury the government's interpretation of his credibility, we believe that the rule of *Caminetti* should apply to the present case.

We have concluded that appellant waived her privilege against self-incrimination with respect to her activities during the interval between her arrival in Las Vegas and her arrest in San Francisco. Therefore, it was permissible for the government to ask questions about this period, even though they led to 42 assertions of the Fifth Amendment.

5. Finally, appellant contends that the trial court committed reversible error by stating initially that her privilege against self-incrimination continued in full effect even if she testified but then ruling later in the trial that she had waived her privilege by testifying. Appellant asserts that she testified only in reliance upon the first ruling, and that she would never have spoken if she had known or thought that the court would allow the government to ask questions which resulted in her invocation of the Fifth Amendment. She concludes that the prejudicial effect of her repeated use of the privilege was great, and that her conviction must therefore be reversed.

We find two flaws in appellant's theory. First, the record does not show a firm, unequivocal ruling by the trial court which appellant justifiably could have relied upon in believing that her Fifth Amendment privilege was not subject to waiver. During a special hearing on the voluntariness of certain of appellant's statements, the trial judge did misrepresent or ignore the controlling case law, *see Brown v. United States, supra,* by stating his belief that a defendant never waives his privilege against self-incrimination by taking the witness stand.[8] Although the court's statement was somewhat confusing and misleading, appellant could not reasonably have believed that this pronouncement, given in the very limited context of a voluntariness hearing, was a promise to her that she could testify on the merits during the trial without subjecting herself to cross-examination or comment upon her refusal to answer

---

**7.** The indication in *Brown v. United States, supra,* 356 U.S. at 154–55, 78 S.Ct. 622, that a defendant retains a privilege against self-incrimination as to subjects not related to his direct testimony suggests that the prosecution may not comment upon the defendant's silence on matters beyond the scope of his direct examination.

**8.** During this hearing, the court appeared to follow the rule of *Calloway v. Wainwright, supra,* 409 F.2d at 66, by holding that appellant had not waived her privilege against self-in-

crimination by testifying on the voluntariness of her statements. This narrow ruling was preceded by broad language on the possibility of waiver of Fifth Amendment rights:

"I don't think the defendant ever waives the right of self-incrimination by taking the witness stand, and she has the right—or she has the right to assert that privilege in any proceeding at any time in any place under the Constitution of the United States. So I will have to rule she has not waived." R.T. 473.

government questions. The only proper and truly binding decision on the issue of appellant's waiver of her Fifth Amendment rights was the formal, specific ruling in which the court held that there had been a waiver. *See United States v. Hearst, supra.*

Appellant points to another segment of the trial in which the court appeared to reaffirm its earlier statement.[9] However, this second opinion about nonwaiver was made after appellant had testified on direct examination. Since she had already testified, this misstatement of the law was harmless. Appellant cannot claim now that she relied upon it.

■ Second, we do not believe there is sufficient evidence that appellant relied upon the court's initial opinion, given during the voluntariness hearing, in electing to testify. Before we may conclude that a defendant was prejudiced by an erroneous or subsequently modified ruling by a trial court, there must be some showing or reasonable inference that he did in fact rely upon the decision. *See Johnson v. United States*, 318 U.S. 189, 197, 63 S.Ct. 549, 87 L.Ed. 704 (1943). If the defendant ignored the ruling or did not base his actions on it, there is obviously no prejudicial error. To vacate a conviction in these circumstances would be to accord the defendant a windfall gain unrelated to any harm he suffered during the trial. It would also have the effect of locking a court into mistaken rulings made during the heat of trial and of preventing it from revising these decisions after considered reflection. As long as there is no evidence of detrimental reliance by the defendant, the course of justice is well served when a trial judge corrects his mistakes and saves an appellate court from the time-consuming task of remedying easily preventable errors.

Appellant has produced no proof, other than her bare assertion, that she would not have testified but for the "promise" made by the trial court of continuous protection under the Fifth Amendment. Recognizing that such direct evidence is difficult to produce, courts do examine the entire trial transcript to determine whether it is probable that the defendant was misled by an erroneous ruling of the lower court. In *Johnson v. United States, supra,* for example, the trial court mistakenly granted the defendant's claim of privilege but later permitted the prosecutor to comment adversely upon the use of the privilege. Emphasizing that the record showed the defendant almost certainty testified in reliance upon the early ruling, the Supreme Court found error in the trial court's change of position. *Id.* at 197–98, 63 S.Ct. 549.

■ In the present case, however, we do not believe the transcript shows that appellant testified only as a result of the trial court's initial statement. The government presented a strong case against appellant. It introduced undisputed evidence that she had participated in the bank robbery. Since bank robbery is a crime requiring only a general intent, the jury could have inferred the requisite intent from the very commission of the act. *United States v. Hartfield, supra,* 513 F.2d at 259; *United States v. Porter, supra,* 431 F.2d at 10. Appellant's only hope was to testify about her role in the robbery. She could not have relied solely on the testimony of her expert witnesses, for the government presented an impressive array of psychiatric testimony disputing appellant's claim that she had participated involuntarily in the robbery. We believe that appellant would have testified even if the trial court had ruled at the

---

9. The trial court sustained some of defense counsel's initial objections to the cross-examination of appellant, stating:

"I would agree with you [the United States Attorney] that the defendant's refusal to answer on the grounds that she might tend to incriminate herself, cuts off any inquiry into that area.

"Now, however, that is a constitutional right she has. And, I intend to see that she has the right to—that is not only set forth her claims, but to maintain them during the course of this trial.

"That's what the constitutional prohibition against self-incrimination means.

"And, it means that in all its significance. And, I intend to carry it out." R.T. 1557.

beginning of the trial that her privilege against self-incrimination was subject to waiver.

### III. *Admission of the Tobin Tape*

While in custody at the San Mateo County Jail, appellant was allowed to receive and talk with visitors. On September 20, 1975, two days after her arrest, one of her visitors was her childhood friend, Patricia Tobin. During the visit with Tobin, which took place in the jail's visiting room, appellant and Tobin communicated over a telephone-like intercommunication system while looking at each other through a bullet-proof glass window. Most of the conversation between the two was monitored and recorded through a switchboard-type device operated by a deputy sheriff. The deputy conducted this monitoring and recording pursuant to an established jail policy. As the supervisor of the jail testified:

> We monitor selected cases and at random cases also, and record those plus manual monitoring to watch for security problems within our facility.

Officials at the jail had previously determined to record all of appellant's conversations with her visitors in accordance with the jail policy for "very publicized cases or high security problems."

The jail supervisor delivered the recording of the conversation with Tobin (the Tobin tape) to the FBI and the prosecution. Appellant timely moved to suppress the tape, contending that it was made and delivered to the government in violation of the Fourth, Sixth, Ninth and Fourteenth Amendments. The district court denied the motion, *United States v. Hearst*, 412 F.Supp. 888 (N.D.Cal.1976), and the government thereupon cross-examined both appellant and Tobin with respect to the taped conversation. In addition, portions of the transcript of the tape were read to the jury.

Appellant now makes a three-pronged attack on the government's use of the Tobin tape. First, she contends that the monitoring and recording of her conversations with visitors in the jail violated her Fourth Amendment rights. Second, she argues that, regardless of the constitutionality of the original monitoring and recording, the jail supervisor's delivery of the tape to the government and its subsequent use of the tape constitutes an independent violation of the Fourth Amendment. Finally, she argues that the government violated her Sixth Amendment right to counsel by "surreptitiously making itself a party to [her] conversations and thereby deliberately eliciting incriminating statements made in the absence of counsel."

### A. *The Monitoring and Recording*

In *Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), the Supreme Court addressed a Fourth Amendment challenge to the electronic interception of a conversation between a jail prisoner and a visitor, Lanza. Unknown to the two, jail officials, by means of an electronic device installed in the visitors' room at the jail, had listened to and transcribed the conversation. The transcript was then delivered to a state legislative committee investigating possible corruption in the state parole system. Lanza was called before the committee where, after receiving immunity, he refused to answer a series of questions. Because of this refusal, he was convicted of a misdemeanor. Lanza attacked the conviction, charging that the interception of the conversation was violative of Fourth Amendment principles incorporated in the Due Process clause of the Fourteenth Amendment and that the committee interrogation was based on information derived from the improper interception. Accordingly, he argued, it was a denial of due process to convict him for failing to answer the committee's questions.

Regarding Lanza's Fourth Amendment claim, the Supreme Court observed that

> to say that a public jail is the equivalent of a man's "house" or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amend-

ment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's "house," and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day.

*Id.* at 143, 82 S.Ct. at 1220–21 (footnotes omitted).[10]

Because of the obvious similarity between the facts in *Lanza* and the facts surrounding the making of the Tobin tape, and in response to the district court's reliance on *Lanza,* appellant argues that the case no longer has precedential value. In appellant's view, the Supreme Court's decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), effectively overruled *Lanza* or at the very least significantly reduced its precedential value. In *Katz,* the Court held that the government's electronic interception of Katz's conversation in a phone booth violated the Fourth Amendment. Rejecting Katz's formulation of the issue—whether the phone booth was a "constitutionally protected area"—the Court stated that "the Fourth Amendment protects people, not places." *Id.* at 351, 88

S.Ct. at 511. Appellant contends that it is this language that undercuts *Lanza,* with its discussion of private (business office, store, hotel room, house, car, and taxicab) and nonprivate (jail) places. *See Lanza v. New York, supra,* 370 U.S. at 143, 82 S.Ct. 1218.

Post-*Katz* decisions of this circuit dealing with jailhouse searches and seizures, however, have treated *Katz* and *Lanza* as compatible. *United States v. Dawson,* 516 F.2d 796, 805 (9th Cir.), *cert. denied,* 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975); *United States v. Hitchcock,* 467 F.2d 1107, 1108 (9th Cir. 1972), *cert. denied,* 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973). Further, these cases relied principally on *Katz* which unquestionably continues to have precedential value, in developing a rule that defeats appellant's Fourth Amendment claim in the present case: An intrusion by jail officials pursuant to a rule or policy with a justifiable purpose of imprisonment or prison security is not violative of the Fourth Amendment. *United States v. Dawson, supra,* 516 F.2d at 805–06; *United States v. Savage,* 482 F.2d 1371, 1373 (9th Cir.), *cert. denied,* 415 U.S. 932, 94 S.Ct. 1446, 39 L.Ed.2d 491 (1973). Under this rule, a prisoner is not deprived of all Fourth Amendment protections; the rule recognizes, however, the government's weighty, countervailing interests in prison security and order. *Cf. Procunier v. Martinez,* 416 U.S. 396, 404–14, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).[11]

10. In addition to other attacks on *Lanza,* appellant argues that the quoted language is merely dictum and, further, that the Supreme Court, because of the existence in the case of an adequate and independent state ground for the judgment, lacked jurisdiction to reach the federal question. *See Lanza v. New York,* 370 U.S. 139, 147, 82 S.Ct. 1218, 8 L.Ed.2d 384 (Warren, C. J.); *id.* at 150, 82 S.Ct. 1218 (Brennan, J.).

Whether or not the court lacked jurisdiction to reach the federal issue is irrelevant for our purposes. The fact remains that it did discuss the issue. Whether that discussion was merely dictum or constituted an alternative ground for the affirmance, however, is clearly relevant and presents a difficult question. In any event, the fact that the plurality expressed its views on the federal issue in the face of strong argu-

ments from the minority that it had no jurisdiction to do so convinces us that, whether dictum or holding, it has persuasive value.

11. Appellant distinguishes between pretrial detainees and prisoners who have been duly convicted, arguing that because the former must be presumed innocent they should not be subjected to the same prison surveillance permitted of the latter. This argument is appealing only when the status of pretrial detainees is considered in the abstract. When pretrial detainees and their liberty interests are placed in balance with the countervailing governmental interests, appellant's distinction loses much of its force. All legitimate intrusive prison practices have basically three purposes: "the preservation of internal order and discipline, the maintenance of institutional security against

Here the government adequately established that its practice of monitoring and recording prisoner-visitor conversations was a reasonable means of maintaining prison security. Indeed, appellant makes no very serious argument to the contrary. Rather, she focuses her arguments almost exclusively on the other end of the balance beam: the prisoner's interest in privacy. But once the government establishes that its intrusion is for " '[a] justifiable purpose of imprisonment or prison security,' " *United States v. Dawson, supra,* 516 F.2d at 806, citing *United States v. Savage, supra,* 482 F.2d at 1373, the Fourth Amendment question is essentially resolved in its favor. This approach is reflective of both the federal courts' "broad hands-off attitude toward problems of prison administration," *Procunier v. Martinez, supra,* 416 U.S. at 404, 94 S.Ct. at 1807, and traditional notions regarding official surveillance of prisoners, *Lanza v. New York, supra,* 370 U.S. at 143, 82 S.Ct. 1218, with the concomitant reduction in reasonable prisoner expectations of privacy. *United States v. Hitchcock, supra,* 467 F.2d at 1108.

One further consideration in the present case reinforces our conclusion that the monitoring and recording of prisoner-visitor conversations was reasonable and therefore not violative of the Fourth Amendment. In *Procunier v. Martinez, supra,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224, the Supreme Court was confronted with a First Amendment challenge to mail censorship brought by California prisoners. The Court did not prohibit all censorship. Rather, it recognized the weighty governmental interests in prison security and order and prisoner rehabilitation and permitted censorship that both furthered one of those interests and was no broader than necessary to accomplish its purpose.

In reaching its conclusion, the Court observed:

Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity, whether within or without the prison. Similarly, prison officials may properly refuse to transmit encoded messages. Other less obvious possibilities come to mind . . . .

*Id.* at 413, 94 S.Ct. at 1811. It would be anomalous indeed to permit prison officials to intercept *written* correspondence between prisoners and outsiders in an effort to ferret out escape plans or other criminal activity, while at the same time prohibiting the interception of *oral* communications between prisoners and visitors conducted for essentially the same purposes: prison security and order. Yet this is practically what appellant urges. We do not believe that the Bill of Rights and the Fourteenth Amendment require such an artificial distinction.

B. *Intergovernmental Use of the Tobin Tape*

In her argument that the Fourth Amendment prohibits interagency or intergovernmental use of evidence originally "seized" in a constitutionally valid manner, appellant relies primarily on our decision in *Bubis v. United States,* 384 F.2d 643 (9th Cir. 1967). That case, however, is poor authority for her novel argument. There, the telephone company suspected that Bubis was using a multi-frequency signal generator to circumvent the company's automatic record-keeping equipment and thereby avoid long-distance charges. As part of its investigation, the company connected monitoring equipment to his telephone line. During the first few days of the monitor-

---

escape or unauthorized entry, and the rehabilitation of the prisoners." *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974) (footnote omitted). The first two interests are implicated regardless of the status of the prisoner. The third, of course, applies only to prisoners already convicted of crime. Accordingly, a pretrial detainee may

assert his status as a shield against intrusive practices aimed solely at rehabilitation but not against practices aimed at security and discipline. Here there is no argument that the jail practice of monitoring and recording prisoner-visitor conversations had any purpose other than jail security and order.

ing, the company learned that Bubis was indeed using a frequency generator; it also overheard conversations that "sounded like gambling." The monitoring continued for over three months, after which time the company reported its suspicions regarding the gambling operations to the federal government. A grand jury subpoenaed the tape recordings and indicted. On the basis of the recordings, Bubis was convicted of federal gambling offenses. Relying solely on our construction of the applicable federal statute, we reversed, holding that the telephone company's *interception* was broader than necessary. Regarding the telephone company's *disclosure* of Bubis' conversations to the federal government, we stated in dictum that the statute also prohibited that. *Id.* at 648 n.5.

In our view, *Bubis* has no bearing on our resolution of appellant's Fourth Amendment challenge to intergovernmental use of the Tobin tape. First, the holding in *Bubis* was that the interception was invalid because the telephone company extended its intrusion too long; any statement concerning the lawfulness of disclosure following a lawful interception was gratuitous and unnecessary to the decision. Second, our decision involved no constitutional analysis; it simply interpreted and applied a statutory provision governing the communications industry.

No independent reason appears why the Fourth Amendment should be construed to prohibit the intergovernmental exchange of the Tobin tape that occurred here. We decline to mutate the prohibitions of the Fourth Amendment, which deal with government-instigated searches and seizures, into a code of regulations governing interagency transfer of evidence legitimately in government control. *But cf. United States v. Birrell,* 470 F.2d 113 (2d Cir. 1972). Here, we have already held that the appellant-Tobin conversation was "seized" in a

manner not inconsistent with the Fourth Amendment. Accordingly, we reject appellant's argument that the transfer of the Tobin tape was constitutionally impermissible.[12]

## C. *Right to Counsel*

■■■ Appellant's Sixth Amendment right to counsel argument is based upon *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Massiah and a codefendant were indicted on a federal narcotics charge. After retaining his own lawyer, Massiah pleaded not guilty and was released on bail. The codefendant was also released on bail and soon thereafter decided to cooperate with the government agents who were continuing the investigation of Massiah's narcotics activities. A police agent installed a radio transmitter under the seat of the codefendant's car and then suggested to him that he induce Massiah to enter the car and talk about the case. Massiah did so and his monitored and recorded incriminating statements were used at his trial. The Supreme Court overturned his conviction, holding that Massiah "was denied the basic protections of that [Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S.Ct. at 1203.

The obvious problem with applying *Massiah* to the facts surrounding the making of the Tobin tape is the absence of any governmental effort to elicit incriminating statements from appellant. There is no suggestion that Tobin, at government direction, engaged appellant in the conversation later used against her. Appellant argues, however, that the Court in *Massiah* held that deliberate, secret listening [13] suf-

---

**12.** We emphasize that there is no direct allegation that the jail authorities monitored and recorded the Tobin conversation for any purpose other than prison security. No argument is advanced that law enforcement agencies used prison security as a guise for what was essen-

tially an effort to gain incriminating evidence for use against appellant in her trial.

**13.** There is some evidence in the record that appellant was aware that her conversation with Tobin was being monitored. The district judge

ficed as the prohibited "deliberate elicitation" of incriminating statements. Interrogation, in appellant's view, is not required by *Massiah.*

■ This interpretation of *Massiah* must fail. The Supreme Court in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), recently interpreted *Massiah* in a manner directly opposed to appellant's contention. In *Brewer,* the Court stated in unambiguous terms that "no such constitutional protection [of the right to assistance of counsel at the time the defendant made the incriminatory statements] would have come into play if there had been no interrogation." *Id.* at 400, 97 S.Ct. at 1240. Relevant to appellant's argument that by secretly listening to incriminating statements the government violated the rights defined in *Massiah,* the Court stated: "That the incriminating statements were elicited surreptitiously in the *Massiah* case, and otherwise here, is constitutionally irrelevant. . . . Rather, the clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation *when the government interrogates him.*" *Id.* at 400–01, 97 S.Ct. at 1240 (emphasis added; citations omitted). Thus, under *Massiah,* as interpreted by *Brewer,* there was no violation of appellant's Sixth Amendment right to the assistance of counsel because there was no interrogation of her—either formally or surreptitiously—by the government.

## IV. *Exclusion of the October 2 Tape*

To support her duress defense, appellant called two psychiatrists, Dr. Louis J. West and Dr. Robert J. Lifton. During direct examination of West, appellant's counsel invited him to describe and compare appellant's behavior and mental condition shortly after her arrest and her behavior on the witness stand approximately four months later. Apparently in an effort to corroborate West's description of her mental condition as revealed in their initial post-arrest

interviews, appellant then sought permission to play a tape recording of a "representative" interview which occurred on October 2, 1975, shortly after her arrest. The government objected, characterizing the taped interview as "cumulative and unnecessary" and charging that it was being offered only for its (presumably emotional) "effect." The prosecutor stated that the better course was to allow West to read pertinent passages from the transcript of the October 2 tape. Appellant retorted that the tape should be admitted both to corroborate West's testimony and to reveal the basis for the opinion of Lifton, who had not yet testified and who had relied on the tapes of West's post-arrest interviews with appellant in forming his opinion.

The district court sustained the government's objection. The court concluded that the tape would be "just very cumulative," that appellant had already "taken a considerable period of time in direct examination of Dr. West," and that West had been able to "speak for himself" in describing the post-arrest interviews. West had, in the court's view, "very and completely and fully amplified" his testimony. Appellant then withdrew the request for admission "insofar as Dr. West is concerned."

During Lifton's testimony, appellant again requested that the October 2 tape be admitted as evidence. The government objected on the grounds that the tape would be cumulative and that to play the tape would take too much time. The district court sustained the objection.

■ The basis of the district court's ruling was Fed.R.Evid. 403, which provides in part:

Although relevant, evidence may be excluded if its probative value is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

By the choice of the term "substantially outweighed," there was adopted a basic pol-

made no explicit finding regarding appellant's actual knowledge. However, because of our

disposition of the issues raised in part III, the lack of such a finding is immaterial.

icy favoring admissibility of relevant evidence. The Rules also, however, confer broad discretion on the trial judge to exclude evidence on any of the grounds specified in Rule 403, including "undue delay, waste of time, or needless presentation of cumulative evidence." *United States v. Hendrix,* 549 F.2d 1225, 1230 (9th Cir. 1977); *Bunn v. Caterpillar Tractor Co.,* 415 F.Supp. 286, 291 (W.D.Pa.1976); 2 Fed.R.Evid.News 33 (1977). Accordingly, we reverse a district court's ruling on such matters only if we are convinced that the decision constitutes an abuse of discretion. *See Hamling v. United States,* 418 U.S. 87, 125, 127, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

■ After reviewing the facts surrounding the district court's decision to exclude the October 2 tape, we conclude that that decision did not amount to an abuse of discretion. The tape was one hour and forty-five minutes long. Appellant requested that it be played in its entirety. When the court denied that request, it did not preclude appellant from reading or playing pertinent portions, and indeed the government, in stating its objection, invited the witnesses to read "particular" parts of the transcript of the tape. *See Bunn v. Caterpillar Tractor Co., supra,* 415 F.Supp. at 291. Appellant has made no showing that this more selective and less time-consuming approach would have been inadequate for her purposes.

Also, West testified freely and at length about his post-arrest interviews with appellant. Lifton likewise had full opportunity to describe what he had learned by listening to the tapes of those interviews. Further, as the district court expressly noted, both men were articulate, expressive and fully capable of communicating to the jury the bases for their opinions, including the substance of the October 2 interview. In an analogous situation, the Supreme Court upheld a district court's decision to exclude certain material as cumulative when the same material was treated in the testimony of the defendant's expert witnesses. *Hamling v. United States, supra,* 418 U.S. at 125–27, 94 S.Ct. 2887. Although reaffirming that a defendant "is entitled to an opportunity to adduce relevant, competent evidence bearing on the issues to be tried," *id.* at 125, 94 S.Ct. at 2911–12, the Court found no abuse of discretion in light of the principle that the "District Court retains *considerable latitude* even with admittedly relevant evidence in rejecting that which is cumulative . . . ." *Id.* at 127, 94 S.Ct. at 2912 (emphasis added). We likewise conclude that the district court in this case acted within the bounds of its broad discretion when it excluded the October 2 tape.[14]

## V. *Exclusion of Psycholinguist Testimony*

■ As part of its effort to rebut appellant's defense that her co-participants compelled her to engage in the bank robbery, the government introduced certain pre-arrest tape recordings carrying appellant's voice and certain pre-arrest manuscripts which she wrote. The essence of the message in those communiques was that she acted voluntarily in robbing the bank. During her trial testimony, appellant asserted that she had not authored the communiques spoken or written by her, that they were authored by certain of her captors, and that she spoke or wrote them under coercion and not voluntarily.

---

**14.** Appellant also challenges the district court's decision to exclude the October 2 tape on the ground that the court did not listen to the tape or read the transcript before ruling. While we believe that the better practice is for the district court to examine proffered evidence before ruling on its admissibility, the circumstances involved here render the district court's approach unobjectionable. The court was made aware of the general content of the West-appellant interviews by West's testimony regarding them during the trial. More significantly, prior to making his pretrial ruling that appellant was competent to stand trial, the district judge read West's report, which he characterized as "voluminous in detail" and as repeating "in lengthy detail the defendant's account" of her experiences. *United States v. Hearst,* 412 F.Supp. 858, 861, 862 (N.D.Cal. 1975). (West, pursuant to court appointment, conducted the October 2 and other post-arrest interviews to determine appellant's competency.) This familiarity with the substance of the October 2 interview provided an adequate basis for the court's ruling.

Appellant then attempted to have a psycholinguist, Dr. Margaret Singer, testify that appellant did not author the communiques. The district court, after characterizing Singer as "an eminently qualified clinical psychologist" and a "recognized expert" in psycholinguistics, *United States v. Hearst*, 412 F.Supp. 893, 894 (N.D.Cal.1976), refused to permit her to testify. The judge articulated three grounds upon which he exercised his discretion. First, the court indicated that the use of psycholinguistics for authorship attribution had not yet "achieved such general acceptance among psychological and scientific authorities as to justify courts of law in admitting expert testimony on this subject." *Id.* at 895. Second, the relevancy of evidence on the issue of authorship was minimal. In the district court's words:

> The issue with respect to these writings or tape recordings is the defendant's *state of mind* at the time she wrote or uttered the words used. Whether or not the defendant herself authored or composed the sentences chosen to express the ideas conveyed in the writings is immaterial to the issue of whether she subscribed to these ideas—that is, *whether she meant what she said.*

*Id.* (emphasis in original). Third, "the significance of [Singer's proposed] testimony did not warrant the inordinate consumption of time that would have been necessitated" by that testimony and any rebuttal testimony. *Id.*

Without passing on the district court's first ground for its ruling, and assuming the evidence was relevant, we pass to the third stated ground for refusing the testimony. As noted in part IV, *supra*, the district court has broad discretion to exclude even relevant evidence if "its probative value is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. Here a variety of considerations support the district court's ruling. First, that appellant did not author the communiques was not a contested fact. Both appellant and Lifton testified that she was not the author, and the testimony of Dr. Kozol, one of the government's expert witnesses, supported rather than contradicted this contention.[15] Second, although evidence of nonauthorship may have been relevant to the ultimate issue of voluntary endorsement, the probative value of such evidence was relatively light.[16] In the balancing process required by Rule 403, the considerations of delay and needless cumulation appear substantially more weighty than the probative value of nonauthorship, an undisputed fact. Third, appellant had no independent right to introduce Singer's testimony to corroborate her own story regarding nonauthorship. As already noted, the government never contested her asserted nonauthorship. Singer's corroborative testimony, therefore, was not allowable *as such*. We conclude that the district court did not abuse its discretion in excluding the testimony of Singer.

## VI. *Ultimate Issue Testimony*

As her final argument, appellant contends that the district court erred in permitting the government's experts to ex-

---

15. Appellant argues that both Kozol in his testimony and the prosecutor in his closing argument attributed authorship of the communiques to her. This contention is not supported by the record. Kozol opined and the prosecutor argued that appellant voluntarily adopted and endorsed the message of the communiques. Kozol further suggested that appellant supplied some of the information used in one of the communiques. But neither Kozol nor the prosecutor ever stated to the jury that appellant was the author.

16. In an effort to enhance the probative value of Singer's proposed testimony, appellant ar-

gues to us that Singer's expertise would have permitted her to testify regarding not only authorship but also appellant's intent in voicing or writing the various communiques. This aspect of Singer's testimony, however, was never presented to the district court for its consideration in the balancing process. Indeed, when appellant first attempted to introduce Singer's testimony, appellant's counsel stated, "We are not going after intent at all, just authorship." This new ground for admission, raised by the appellant for the first time on appeal, comes too late.

press their opinions on the "ultimate issues" of duress and voluntariness. In response to a question from the prosecutor, one expert, Dr. Fort, gave as his opinion that appellant "did not perform the bank robbery because she was in fear of her life. She did it as a voluntary member of the SLA." The other expert, Dr. Kozol, stated: "I think she entered that bank voluntarily in order to participate in the robbing of that bank. This was an act of her own free will."

Fed.R.Evid. 704 states the law regarding expert opinion testimony on ultimate issues. It provides:

> Testimony in the form of an opinion or inference otherwise admissible is *not objectionable* because it embraces an ultimate issue to be decided by the trier of fact.

(Emphasis added.) Appellant makes two arguments in an effort to establish that Rule 704 does not render Fort's and Kozol's opinions admissible. First, she contends that those opinions were not "otherwise admissible" within the meaning of Rule 704 because Fort and Kozol were qualified to testify only within the realm of their expertise, psychology and psychiatry. She argues that because the ultimate issues of duress and voluntariness are "commonsense" concepts that combine "moral and empirical considerations with a legal conclusion," the doctors' testimony on those issues went beyond their expertise and became merely statements of "personal morality."

We find this argument without merit. The doctors' discipline is concerned with both the motives of human conduct and the variety of behavioral responses to physical, emotional and mental stimuli. Such matters were critical to the defense raised by appellant. She conceded as much by calling three expert witnesses and building her defense on their testimony regarding the effects of the captors' coercion on her behavior and mental state. Once it is conceded that experts in psychology and psychiatry can be of help to a jury faced with a defense such as appellant raised, we see no basis in this case for limiting their opinions to subsidiary issues and prohibiting them from opining whether appellant entered and robbed the bank voluntarily or under duress.

Appellant constructs her second argument regarding the applicability of Rule 704 on a portion of the Advisory Committee's note on that rule:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. . . . [Rules 403, 701, and 702] also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Appellant contends that the question, "Did appellant voluntarily rob the bank?" is legally and conceptually identical to the question, "Did T have capacity to make a will?" thus requiring exclusion of the question and the opinion it elicited.

We disagree. The Advisory Committee's phrase "inadequately explored legal criteria" refers to terminology, the meaning of which is not reasonably clear to laymen. The term "capacity to make a will" is an example of that type of terminology because the average layman would *not* know that it encompasses the ability, first, to know the nature and extent of one's property, second, to identify the natural objects of one's bounty, and third, to formulate a rational plan of distribution. The terms "voluntarily rob a bank" or "act under fear of death or grave bodily harm" do not suffer from that same disability. The average layman would understand those terms and ascribe to them essentially the same meaning intended by the expert witness. Rejecting all of appellant's arguments on this issue, we conclude that the opinions of Kozol and Fort were properly admitted under Fed.R.Evid. 704.

We are reinforced in this conclusion by our review of the testimony of appellant's expert witnesses. They repeatedly made

statements on and references to the "ultimate issues" of coercion, duress and voluntariness. In their testimony on direct examination, for example, they stated that she "was coerced into doing" the bank robbery and that "she complied with everything they [her captors] told her to do." Significantly, this testimony came after the government objected to it on the ground that such opinion testimony regarding coercion would usurp the jury's function. Appellant succeeded in having those objections overruled. The Kozol and Fort opinions elicited by the government were no more than responsive to the testimony of appellant's experts. *Cf.* McCormick on Evidence § 57, at p. 132–33 (2d ed. Cleary 1972); *Teague v. United States*, 268 F.2d 925, 927 (9th Cir. 1959); *Meyers v. United States*, 147 F.2d 663, 667 (9th Cir. 1945).[17]

Five days after sentencing, appellant filed a motion for new trial based on newly discovered evidence. The district court denied the motion. *United States v. Hearst*, 424 F.Supp. 307 (N.D.Cal.1976). More than a month later appellant filed a motion to reconsider, calling the court's attention to the recent case of *United States v. McCrane*, 547 F.2d 204 (3d Cir. 1976). The district court rejected the motion to reconsider as not timely filed and, in any event, as without merit. *United States v. Hearst*, 435 F.Supp. 29 (N.D.Cal.1977). This ruling is the subject of appellant's second appeal, No. 77–1759.

 We agree with the district court that the motion was both untimely and without merit for the reasons stated in the district court's opinion. On the merits, appellant's request for *Brady* material was clearly a general one, *see* 435 F.Supp. at 30–31, and, as the district court held, *see* 424 F.Supp. at 312–14, the omitted evidence was not "obviously exculpatory," *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and did not

create a reasonable doubt as to appellant's guilt. *Id.* at 112, 96 S.Ct. 2392.

Affirmed.

---

**17.** Appellant argues that the Kozol and Fort opinions are distinguishable from the opinions of her experts on the issues of duress and coercion because the former exceeded the bounds of the witnesses' expertise while the latter did not. Thus, appellant contends, the Kozol and Fort opinions were far more than a fair response to the testimony of appellant's experts. We have already concluded, however, that the Kozol and Fort opinions, questions of parity aside, were properly admitted.