**UNITED STATES of America,**
**Plaintiff,**

v.

**Cornelius PEOPLES and Xavier**
**Lightfoot, Defendants.**

**Nos. 98–00149–01–CR–W–6,**
**98–00149–02–CR–W–6.**

United States District Court,
W.D. Missouri,
Western Division.

Oct. 6, 1999.

Matt Whitworth, Mark Miller, United States Attorney's Office, Kansas City, MO, for plaintiff.

Jay DeHardt, Kansas City, MO, William Odle, Kansas City, MO, for defendants.

### *MEMORANDUM AND ORDER*

SACHS, District Judge.

The court has received Judge Larsen's reports and recommendations regarding the defendants' motions to suppress recordings of telephone and visitation conversations. Because trial is imminent the court heard argument (supplemented by limited additional briefing) and has studied the transcripts of hearings and reviewed exhibits. After de novo review the court will adopt the reports and recommendations and deny the motions.

The reports are exhaustive, both on the law and the evidence heard at the suppression hearings. Little needs to be added, by way of comment, qualification or elaboration.

Telephone conversation recordings taken in a prison setting (in this case pretrial detention at a contract facility) have now become rather routinely admissible, on an implied consent theory. In my experience, this occurred in *United States v. Emery,* 186 F.3d 921 (8th Cir.1999), and the Milton Terry Kelton litigation, *United States v.*

*Swinney,* 970 F.2d 494 (8th Cir.1992). Nothing about the reports and recommendations on that subject needs further discussion.

The trial use of recordings of visitation conversations is distinctly less usual, and initially may seem controversial and doubtful. I find nothing favorable to defendants, however, in litigation on this subject since the adverse ruling in the Patty Hearst case, *United States v. Hearst,* 563 F.2d 1331 (9th Cir.1977). As in this case, there were recordings of visitation conversation with a pretrial detainee, apparently without giving formal notice to the parties. Defendants contend *Hearst* is distinguishable because that was a Fourth Amendment case, whereas this case involves recordings at a nongovernmental prison in alleged violation of a statute. As pointed out by Judge Larsen, however, the capture and use of oral communications is governed by Fourth Amendment concepts. Assuming the *Hearst* case is consistent with the Fourth Amendment (and defendants have not argued to the contrary), they would have to distinguish that case more probingly than to say this case is statutory.

It can be argued that *Hearst* does not authorize surveillance and taping rights when motivated by something other than "jail security and order." No argument was made in *Hearst* that the policy of recording in "'very publicized cases'" shows an inappropriate motivation. 563 F.2d at 1344, 1346 n. 11, 1347 n. 12. The issue of improper subjective motivation may, however, no longer be pertinent. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The severe attenuation of privacy interests in a penal context may well qualify for the general rule that "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." 517 U.S. at 814, 116 S.Ct. 1769.[1]

The recommended findings avoid considering such legal novelties. Judge Larsen recommended, and I find, that surveillance and recording of the visitation conversations here was a legitimate, fairly common practice, used in this case to advance appropriate penal interests, without FBI inducement. Knowledge that the FBI might also be interested in the results would not destroy the legitimacy of what occurred.

Defendants urgently advance a theory of pretext. It is an argument, but not a compelling one. For instance, there is no conflict between the warden's testimony that he had not personally authorized earlier surveillance and recording in the visiting room, and the testimony of others that they had routinely engaged in such activity on numerous occasions. Likewise, any confusion in the testimony about exact dates and hours of activity is hardly abnormal—the attorneys themselves got tangled in referencing names and years of past events.

Defendants' privacy expectations and arguments are not established. There was no testimony of subjective expectations.[2] Absence of forewarning was apparently not a factor in *Hearst,* and is not controlling here. One may suppose it would be better practice to give such notice, but not as a matter of constitutional law (which mirrors the statutory protection here involved). The alleged appearance of privacy is also not controlling. Shielding conversations from other visitors and inmates would not fairly suggest that the prison management has no legitimate interest in the conversations. Again, the toilet stall analogy may be apt.

---

1. One can imagine an exception for purely personal edification of the penal authorities. For instance, while it may be supposed that some means of surveillance of toilet stalls may be appropriate to prevent their use for sexual misconduct, one can also suppose that a prurient interest limitation might be created.

2. Both defendants may fully realize there is little or no privacy in prison. One can imagine anger and annoyance, but naive expectations would be unlikely. In any event, unreasonable expectations would not be controlling.

The theories about Kansas law are also far fetched, as an aid to creating reasonable expectations. Defendants have done little to establish that there was in fact a violation of Kansas law, much less a supposition that inmates and visitors are likely to be aware of such statutes or to suppose that they apply in a jailhouse context.

For reasons stated above and in the reports and recommendations the motions to suppress recordings of telephone and visitation conversations are hereby DENIED.

### REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS RECORDINGS OF TELEPHONE AND VISITATION CONVERSATIONS

LARSEN, United States Magistrate Judge.

Before the court is defendant's motion to suppress recordings of telephone and visitation conversations on the grounds that (1) interception violated Title III of the Omnibus Crime Control and Safe Streets Act, (2) interception violated defendant's fourth amendment rights, and (3) interception violated Kansas criminal statutes 21 K.S.A. §§ 4001 and 4002. I find that (1) defendant had no legitimate expectation of privacy in any of the conversations recorded by CCA, (2) the telephone conversations were recorded with the implied consent of Xavier Lightfoot, (3) the in-person conversations were not wire communications or oral communications within the meaning of the federal wiretap law and were therefore not subject to the provisions of that law, and (4) the Kansas criminal statutes cited by defendant do not apply to this federal case. Therefore, defendant's motion to suppress the recorded conversations should be denied.

### I. BACKGROUND

On July 8, 1998, a criminal complaint was filed charging defendant with one count of murdering Jovan Ross with intent to prevent Ross from testifying in an official proceeding, in violation of 18 U.S.C. § 1512(a)(1). Defendant was arrested on July 19, 1998. On July 23, 1998, an indictment was returned charging defendant with the murder of Jovan Ross. On September 11, 1998, a superseding indictment was returned charging defendant and Xavier Lightfoot with the murder of Jovan Ross in addition to one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371.

On March 1, 1999, defendant filed this motion to suppress (document number 156). On April 7, 1999, the government filed a response in opposition to defendant's motion (document number 214). The government points out that the monitoring at CCA was done on the initiative of CCA and not at the behest of the FBI, defendant had no expectation of privacy in the intercepted conversations during his visits to CCA, and CCA has a need to maintain discipline and order within its walls.

On April 14 and 29, 1999, I held a hearing on defendant's motion. Defendant was present in person, represented by Jay DeHardt and William Odle. The government was represented by Assistant United States Attorneys Mark Miller and Matt Whitworth. The parties called the following witnesses:

1. Roger Moore, Assistant Warden at CCA

2. FBI Special Agent Joan Neal

3. James Perry, Chief of Security at CCA

4. William Graf, Warden at CCA

5. Victor Hinke, Jr., former CCA employee.

In addition, the following exhibits were introduced:

P.Ex. 1 Book of transcripts Volume I

P.Ex. 1A Book of transcripts Volume II [1]

---

1. On pages 92 and 98 of the transcript of the April 14, 1999, hearing, exhibit 1A is mistak-

enly referred to as exhibit 2A (1Tr. at 100).

P.Ex. 2 Subpoena dated June 10, 1998[2]

P.Ex. 2A Subpoena dated June 22, 1998

P.Ex. 3 Prisoner handbook

P.Ex. 4 Tape recording dated June 8, 1998

D.Ex. 5 Affidavit of Special Agent Joan Neal

D.Ex. 8 Lightfoot visitation list[3]

D.Ex. 9 Report of Special Agent Joan Neal dated June 10, 1998

D.Ex. 10 Report of Special Agent Joan Neal dated June 11, 1998

D.Ex. 12 Report of Special Agent Joan Neal dated June 24, 1998

D.Ex. 14 Photograph of visitation booth

D.Ex. 15 Photograph of visitation booth

D.Ex. 16 Photograph of computer to access t/c

D.Ex. 17 Photograph of visitor's recording system

D.Ex. 18 Photograph of t/c computer storage unit

D.Ex. 19 Photograph of t/c visitor's recording system

D.Ex. 20 Henderson termination letter

D.Ex. 21 Call detail dated June 10, 1998

D.Ex. 28 FBI document receipt of duplicate tapes from CCA dated August 5, 1998

D.Ex. 31 Prisoner Information Request dated June 1, 1998

D.Ex. 32 Appointment/visitation log dated May 26, 1998

D.Ex. 33 Grand Jury subpoena to CCA dated June 15, 1998 (same as plaintiff's exhibit 2)

D.Ex. 34 Copy of Kansas statutes on eavesdropping and breach of privacy

D.Ex. 35 Memorandum to Susan Elliott from CCA re: inmate assaults and fights, dated April 21, 1999

D.Ex. 36 Shift report dated June 10, 1998

D.Ex. 38 FBI 302 dated August 3, 1998

D.Ex. 39 Work order dated June 1, 1998

On June 11, 1999, defendant filed a reply brief (document number 310) arguing that the government cannot establish that CCA officers are law enforcement officers within the meaning of the federal wiretap law or that CCA is a law enforcement agency whose employees intercept calls in the ordinary course of their business which is excepted from the federal wiretap law. In addition, defendant argues that witnesses either were not credible or their testimony does not support the arguments raised by the government in its response.

## II. FINDINGS OF FACT

On the basis of the evidence presented during the hearing, I make the following findings of fact:

1. The Corrections Corporation of America ("CCA") is a private facility which operates the Leavenworth detention center (2Tr. at 37, 41).[4] William Graf is the Warden, Roger Moore is the Assistant Warden, and James Perry is the Chief of Security (1Tr. at 16, 139–140).[5] CCA operates under a contract with the United States Marshal Service to house federal pretrial detainees and to provide security for the institution (1Tr. at 16; 2Tr. at 47). CCA does not operate according to the Bureau of Prisons guidelines; however, its own guidelines are similar to those of the Bureau of Prisons (2Tr. at 37, 38, 47). Corrections officers at CCA are employees of CCA—they are not federal, state, or

2. During the hearing, defendant's attorney, Jay DeHardt, was referring to government's exhibit 2 but mistakenly offered it as defendant's exhibit 2 (1Tr. at 67–68).

3. During the hearing, Jay DeHardt showed the witness a visitation list which was marked as defendant's exhibit 8 (1Tr. at 63). Howev-

er, when he offered the exhibit in evidence, he referred to it as exhibit 3.

4. "2Tr." refers to the transcript of the April 29, 1999, hearing.

5. "1Tr." refers to the transcript of the April 14, 1999, hearing.

local law enforcement officers and have no power to execute arrests (2Tr. at 41–42, 47).

2. CCA has been a tobacco-free institution since 1996; therefore, cigarettes are considered contraband (1Tr. at 25–26, 166). Cigarettes smuggled into CCA are sold for as much as $10.00 per pack (1Tr. at 26). As a result, the problem with guards or visitors attempting to smuggle tobacco products into CCA is an ongoing one and is worse than the drug-smuggling problem encountered by CCA (1Tr. at 42, 166). Inmates argue, threaten each other, and fight over cigarettes (1Tr. at 166–167). Stamps, considered contraband if not purchased at the commissary, are often used to purchase cigarettes inside the detention facility (1Tr. at 26, 78).

3. CCA has a telephone system used by the prisoners to make outside calls (1Tr. at 17). The system, installed in April 1998, has a computer that records all conversations of all prisoners and allows for monitoring of the conversation as the call is made (1Tr. at 17, 47–49). Pretrial detainees at CCA are warned that their telephone conversations will be recorded and may be monitored (1Tr. at 18). A notice is published at page three of the inmates' handbook where it states: "Telephone conversations may be monitored and/or recorded for security reasons" (P.Ex. 3; 1Tr. at 19). In addition, there is a warning printed above the telephones which are designed to record and monitor inmate conversations (1Tr. at 18), and before each telephone call, the parties to the conversation hear a recorded warning that the telephone call could be recorded (P.Ex. 4; 1Tr. at 94).

4. Although the handbook and the signs above the telephones indicate that monitoring and recording are possible, the warnings do not inform inmates that recorded conversations may be made available to law enforcement agencies conducting independent investigations (1Tr. at 34, 162). Indeed the recorded conversations are routinely made available to law enforcement agencies and criminal defense lawyers without the necessity of a court order (2Tr. at 18, 20, 32). However, copies of recordings are not distributed to law enforcement agencies absent a court order or a subpoena (2Tr. at 18, 20). Recorded telephone conversations are retrieved from the computer by searching for the telephone number called (1Tr. at 48). No record is kept of law enforcement requests for telephone recordings (1Tr. at 59, 60).

5. There are two visitation rooms at CCA which are divided by a glass partition (1Tr. at 24, 36). Detainees remain in one room and visitors stay in the second room (1Tr. at 24). The visitors and detainees communicate by using an intercom system which is located in the glass partition (1Tr. at 24). Each person uses what appears to be a telephone handset; however, the system is not connected to the telephone monitoring system and it cannot be used to make outside telephone calls (1Tr. at 24–25, 142).

6. Each of the eleven visiting stations may be equipped with recording equipment at the direction of the warden, the assistant warden, or the chief of security (1Tr. at 40, 141, 142). The usual reason for monitoring or recording visits is security concerns or indications that contraband may be smuggled into the institution[6] (1Tr. at 28, 157). Recording in-person conversations is not unusual and is viewed as a normal investigative tool (1Tr. at 157). During the period relevant to this case, there was no notice, either in the prisoners' handbook or the visiting area,[7] to the detainees or their visitors that conversations in the visiting area may be recorded or monitored by CCA (1Tr. at 36, 37, 38,

---

6. In the past, detainees or their families have left cigarettes or drugs in the visiting rooms so that another inmate or the cleaning personnel can smuggle the contraband into the institution (1Tr. at 28).

7. At the present time, there is both a written notice in the prisoners' handbook and notice posted in the visiting area that conversations in the visiting area may be monitored and recorded (2Tr. at 46).

50–51, 61, 62, 63, 162). However, detainees were given notice that their mail would be inspected and their telephone conversations would be monitored (1Tr. at 38). As a result, Assistant Warden Moore believed that it was reasonable for detainees and their visitors to assume that monitoring would be done:

> We check all mail coming in. We check the phones. There is nothing in a prison that is subject, other than attorney-client privileges, that is subject, as far as we are concerned, to privacy.

(1Tr. at 37–38).

7. Joan Neal, a special agent with the Federal Bureau of Investigation ("FBI") became involved in the investigation of co-defendant Xavier Lightfoot in connection with a fall 1997 robbery in Omaha, Nebraska (1Tr. at 82–83). Jovan Ross (the victim of the murder charged in this indictment), had contacted the Overland Park police department and subsequently provided Special Agent Neal with information about Lightfoot's involvement in a bank robbery and several jewelry store robberies (1Tr. at 83). In December 1997, Lightfoot was placed in CCA in connection with an Omaha bank robbery (1Tr. at 16).

8. On May 16, 1998, Ross' house was burglarized (1Tr. at 84, 118–119). Ross contacted Special Agent Neal and stated his belief that defendant and Lightfoot were responsible (1Tr. at 84, 118–119). Special Agent Neal contacted Assistant Warden Roger Moore at CCA and asked whether CCA had the capability of recording conversations (1Tr. at 20, 33, 84–85). Special Agent Neal was told that recorded conversations from April 1998 to the present could be retrieved using telephone numbers but not by using an inmate's name (1Tr. at 20, 58, 84–85). Special Agent Neal provided telephone numbers, and those numbers were given to the Chief of Security, James Perry (1Tr. at 149). Perry ran the numbers through the computer and determined that three or four of them had been called from an inmate at CCA (1Tr. at 149–150).

9. On May 17, 1998, Special Agent Neal went to CCA without a court order or subpoena and she, along with a CCA employee, listened to telephone conversations between defendant and Lightfoot which had previously been recorded and had been retrieved by Perry (1Tr. at 21, 46, 84, 85, 87, 148, 149, 151, 152). Although Special Agent Neal learned little from the recordings because defendant and Lightfoot spoke in code, she and the CCA official did learn from the conversations that CCA may have a corrupt guard (1Tr. at 86). The CCA official concluded from the conversation that a guard was being paid to bring cigarettes into the institution[8] and that Lightfoot was contemplating assaulting another inmate (1Tr. at 86). Aside from that, Special Agent Neal thought there may be something of value in the conversations and therefore requested copies (1Tr. at 153). She was told by Chief Perry that she needed to get a subpoena in order to get copies of the tapes (1Tr. at 154, 155).

10. Once CCA officials learned that Lightfoot may be involved in a cigarette-smuggling scheme involving a guard, the officials began listening to every call they could trace to Lightfoot (1Tr. at 45). After listening to those tapes, the officials became aware that Lightfoot received visits from his family and from defendant, who was determined to be a friend of Lightfoot's (1Tr. at 23, 45–46). The officials decided to tape all of Lightfoot's conversations with people outside the prison; and although the officials had no specific information that defendant was involved in smuggling cigarettes, they suspected he was aware of the scheme and they decided to tape his meetings with Lightfoot so they would not miss any important information (1Tr. at 45–46, 56; 2Tr. at 83).

---

**8.** Chief Perry was already aware that Lightfoot and a guard were involved in cigarette smuggling (1Tr. at 154–155). However, the identity of the guard was not learned until the taped conversations between Lightfoot and his mother were reviewed (2Tr. at 81, 82, 84–85).

11. Officials at CCA installed a recording system in the visiting area in order to tape conversations of Lightfoot in the hopes of furthering their investigation of cigarette smuggling by guards (1Tr. at 29, 30; 2Tr. at 92–94, 110). The decision to record Lightfoot's visits was not made or encouraged by the FBI (1Tr. at 29–30, 95, 119, 132; 2Tr. at 110).

12. Jovan Ross was found dead at about 8:30 p.m. on Monday, June 8, 1998 (1Tr. at 87, 100, 107). The police department notified Special Agent Neal of Ross' death at approximately 10:30 p.m. (1Tr. at 100, 127–128). Soon afterward, Special Agent Neal contacted CCA to see if there were additional recorded telephone conversations involving Lightfoot because she believed Lightfoot was involved in the murder of Jovan Ross (1Tr. at 22, 23, 88). Special Agent Neal learned that CCA had recorded conversations on the computer, but that the computer system was not equipped to store the recordings for very long (1Tr. at 88).

13. On June 9, 1998, Special Agent Neal went to CCA to listen to more tapes, but again she was not allowed to obtain copies of the tapes because she had no subpoena (1Tr. at 54, 67). Special Agent Neal specifically listened to conversations between Lightfoot and defendant which had been recorded about the time of Ross' murder (1Tr. at 89). During the conversations, defendant and Lightfoot appeared to be discussing the murder and at one point referred to defendant's plan to visit Lightfoot at CCA on June 10 (1Tr. at 89a, 90).

14. Special Agent Neal reported to CCA officials that she heard in one of the taped conversations Lightfoot talking to his mother, Barbara Boyd, about a guard receiving a $300 money order (1Tr. at 22, 69; 2Tr. at 21, 22, 57, 78–80). After reviewing the taped conversations, CCA officials concluded that Charles Henderson, a guard, was probably smuggling cigarettes into the prison in exchange for money (1Tr. at 22, 69, 70). A taped conversation between Lightfoot and defendant also revealed that Lightfoot was planning to assault another inmate (1Tr. at 56–57; 2Tr. at 27, 38, 53, 57, 80). Since Lightfoot and the other inmate were in different pods [9] at the institution, Assistant Warden Moore did not believe that the other inmate was in danger (1Tr. at 74). However, Moore was concerned about Lightfoot's threats of assault because Moore knew that Lightfoot has the AIDS virus (1Tr. at 76–77).

15. Assistant Warden Moore and Victor Hinke, the training manager, hooked up the equipment in the visiting area after receiving the OK from Warden Graf to tape the conversations between Lightfoot and his visitors on June 10 [10] (1Tr. at 23–24, 44–45; 2Tr. at 21, 23, 29, 30, 57).

16. On June 10, 1998, the United States Marshal Service confirmed that Charles Henderson was responsible for bringing cigarettes into the institution in exchange for a $300 money gram from Lightfoot' s mother, Barbara Boyd (1Tr. at 54, 60–61). When Henderson arrived to work the afternoon shift, he was questioned and admitted having taken the $300 but denied having brought cigarettes into the prison (1Tr. at 25, 41, 61). Henderson was sent home and was instructed to see the warden the following day (1Tr. at 25; 2Tr. at 54–55).

17. Later that day, Lightfoot was visited by his mother, his grandmother, and

---

**9.** CCA policy prohibits threats against other inmates; however, threats are difficult to prosecute (2Tr. at 97). Therefore, CCA officials must evaluate the seriousness of the threat before deciding on an appropriate response (2Tr. at 109). CCA does not have the physical space to segregate all inmates who threaten each other—there are only nine segregation cells (2Tr. at 97).

**10.** Although Special Agent Neal was aware that CCA intended to tape the meeting between defendant and Lightfoot, she was not present when CCA officials made the decision to monitor and she did not request a recording of the meeting (1Tr. at 91, 108, 129). CCA officials were interested in recording Lightfoot because he was considered to be a security concern (1Tr. at 109, 113; 2Tr. at 27).

defendant (1Tr. at 63–64; 2Tr. at 55–56). All of those meetings were recorded (1Tr. at 64). During the conversation between Lightfoot and his mother, officials heard confirmation that Mrs. Boyd had delivered the $300 money gram to Henderson (1Tr. at 65). There was no indication during any of the recorded conversations that day that defendant was involved in the scheme to smuggle cigarettes or any other contraband into the prison or that he posed a security risk to any inmate at the institution (1Tr. at 65; 2Tr. at 82–83).

18. Also on June 10, 1998, Special Agent Neal had a subpoena served on CCA for "any and all records and information regarding monitoring telephone calls of Xavier Lightfoot" (P.Ex. 2; 1Tr. at 50, 67, 68).

19. On June 11, 1998, Charles Henderson was terminated[11] (1Tr. at 25, 52; 2Tr. at 55). Also that day, Special Agent Neal picked up a tape of the June 10, 1998, meeting between defendant and Lightfoot and also picked up a tape containing nine recorded phones calls (1Tr. at 110, 114; 2Tr. at 87). The subpoena served on June 10, 1998, directed CCA to provide copies of telephone calls but did not specifically direct CCA to provide copies of visitation recordings (1Tr. at 115). At the time, Special Agent Neal did not draw a distinction between telephone tapes as compared to tapes of in-person conversations (P.Ex. 2; 1Tr. at 115).

20. CCA officials were aware that defendant intended to visit Lightfoot at CCA on June 21, 1998, because the two had discussed it during an intercepted telephone call (2Tr. at 94). Special Agent Neal was not provided with this information (1Tr. at 116; 2Tr. at 110). In the intercepted telephone conversation, defendant and Lightfoot discussed trying to get another guard to sell cigarettes and Light-

foot had mentioned that he was going to assault another inmate at the institution (1Tr. at 26; 2Tr. at 95, 110–111). During an intercepted call between Lightfoot and a family member, Lightfoot stated that he had several hundred dollars' worth of postal stamps which he had been unable to sell (1Tr. at 27). Lightfoot asked the family member to redeem the stamps for cash[12] (1Tr. at 27). Finally, Lightfoot stated that he planned to take a package with him when he returned to Omaha, Nebraska (1Tr. at 27). Since inmates are not allowed to take packages from one institution to another, anything Lightfoot intended to take with him was considered by CCA officials to be contraband (1Tr. at 27–28). As a result of the anticipated visit, CCA officials again monitored the visitors' area as authorized by Chief Perry and Warden Graf (1Tr. at 26, 29–30, 64, 156, 158). CCA did not notify the FBI that the visit would be recorded nor did the FBI have any input into the decision to record the conversation (2Tr. at 110).

21. Defendant arrived at CCA to visit Lightfoot on June 21, 1998, as anticipated and the conversation was recorded (1Tr. at 116–117). When CCA officials reviewed the taped conversation, they heard defendant and Lightfoot discussing something buried in Omaha, Nebraska (1Tr. at 117, 120). Special Agent Neal was contacted because of the Omaha discussion (1Tr. at 117, 120). On June 22, 1998, after having been informed that the conversation between defendant and Lightfoot had been recorded and contained discussions about Omaha, Special Agent Neal arranged for a subpoena to be served on CCA in order to get a copy of the tape (P.Ex. 2A; 1Tr. at 92). The subpoena was issued in the Western District of Missouri and sought all prisoner visitation lists for Lightfoot, all inmate telephone numbers request lists for Lightfoot, all audio taped visits between Lightfoot and defendant for the period

---

11. Lightfoot was not disciplined for his involvement in the cigarette-smuggling operation (1Tr. at 66). CCA officials did not pursue discipline because the contraband was intercepted and the institution does not like to

publish among the inmate population the fact that a "dirty" officer was caught (1Tr. at 76).

12. CCA officials searched Lightfoot's cell for stamps or other contraband (1Tr. at 27).

between June 10, 1998, and June 21, 1998, and all intercepted telephone conversations between Lightfoot and anyone else (1Tr. at 71).

22. The intercom system in the visitors' area had been used to tape in-person conversations before the June 10, 1998, conversation involving Lightfoot and defendant (1Tr. at 28, 39, 70, 156–157). In fact, Chief of Security Perry has recorded in-person conversations on more than twenty occasions (1Tr. at 172). These previous instances involved inmates other than Lightfoot (1Tr. at 29). After the recordings of Lightfoot's in-person conversations, there were other investigations involving cigarette smuggling (1Tr. at 43–44, 157).

23. During one such investigation, CCA officials recorded a meeting in the visiting area (1Tr. at 43–44). Officials learned through monitoring the conversation that an inmate's brother planned to leave money for a guard to pick up at the visitors' room as the inmate came in to visit (1Tr. at 29). The guard was seen picking up the money and was subsequently fired (1Tr. at 29). In total, there have been about six or seven guards fired from CCA for smuggling cigarettes to inmates (1Tr. at 171). In addition to smuggling investigations, alleged threats against other inmates have been the cause of CCA's recording in-person visits, which occurred both before and after the recordings of Lightfoot's visits took place (2Tr. at 108–109, 110).

### III. FOURTH AMENDMENT

Defendant argues that his fourth amendment rights were violated when CCA recorded his telephone conversations with Lightfoot and his in-person conversations with Lightfoot. Defendant argues that despite the recording before each call that a telephone call from CCA "is subject to monitoring and recording," that phrase is not sufficient to put defendant on notice that the conversation was actually record-

ed. He further argues that he did not expressly consent to a "public" conversation when he visited Lightfoot, and he had no warning that his in-person conversations would be recorded.

While persons imprisoned for crime enjoy many protections of the Constitution, it is clear that imprisonment carries with it the loss of many significant rights. *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (citing *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). These constraints on inmates, and in some cases the complete withdrawal of certain rights, are "justified by the considerations underlying our penal system." *Id.* (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948).) The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), chief among which is internal security. *Hudson v. Palmer,* 468 U.S. at 524, 104 S.Ct. 3194; *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). "Of course, these restrictions or retractions also serve, incidentally, as reminders that, under our system of justice, deterrence and retribution are factors in addition to correction." *Hudson v. Palmer,* 468 U.S. at 524, 104 S.Ct. 3194.

■ In any fourth amendment case, the court must first determine whether a justifiable expectation of privacy is at stake; that is, whether the person invoking the protection of the fourth amendment can claim a legitimate expectation of privacy that has been invaded by government action. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It must be the type of expectation of privacy society is prepared to recognize as reasonable.[13] *Id.,* at 360–361, 88 S.Ct. 507 (concurring opinion).

---

13. Although defendant must also show a subjective expectation of privacy and argues such

in his brief, the courts are quick to point out

■ After reviewing the case law, I have concluded that prisoners [14] have very little protection stemming from the fourth amendment due to the institution's need to maintain order. The Supreme Court, in *Hudson v. Palmer*, 468 U.S. at 526–27, 104 S.Ct. 3194, had this to say about the needs of the institution compared to the inmates' right of privacy:

> The recognition of privacy rights for prisoners [15] in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.
>
> Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for anti-social, criminal, and often violent conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others....
>
> Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize.

In case after case, courts have noted the diminished privacy rights of those in and visiting prisons. *See Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("The recognition of privacy rights for prisoners in their indi-

that the reasonableness of that expectation is what really counts: As Justice White said, writing for the plurality in *United States v. White*, 401 U.S. 745, 751, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), "Our problem is not what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions.... Our problem, in terms of the principles announced in *Katz*, is what expectations of privacy are constitutionally 'justifiable'...." *Id.*, at 751–752, 91 S.Ct. 1122.

**14.** Although defendant was not the person incarcerated at the time these conversations were recorded, it is clear that prisoner conversations cannot be monitored or recorded without also recording the visitor's part of the conversation. *See Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); *United States v. Hearst*, 563 F.2d 1331 (9th Cir.1977). The interception of calls from inmates to non-inmates does not violate the privacy right of non-inmates. *United States v. Willoughby*, 860 F.2d 15 (2nd Cir.1988).

**15.** Although the quoted section of this case dealt with "prisoners," the Court also pointed out that pretrial detainees have very limited fourth amendment rights as well, citing *Bell v. Wolfish*, 441 U.S. 520, 556–57, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and ... therefore the Fourth Amendment provides no protection for such a person.") *See also United States v. Hearst*, 563 F.2d 1331, 1345 n. 11 (9th Cir.1977) ("When pretrial detainees and their liberty interests are placed in balance with the countervailing governmental interests, [the distinction between prisoners and pretrial detainees] loses much of its force. All legitimate intrusive prison practices have basically three purposes: 'the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners.' *Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (footnote omitted). The first two interests are implicated regardless of the status of the prisoner. The third, of course, applies only to prisoners already convicted of crime. Accordingly a pretrial detainee may assert his status as a shield against intrusive practices aimed solely at rehabilitation but not against practices aimed at security and discipline.")

vidual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."); *Lanza v. New York*, 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962) ("[I]t is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day."); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982) ("Within prison walls, a central objective of prison administrators is to safeguard institutional security. To effectuate this goal prison officials are charged with the duty to intercept and exclude by all reasonable means all contraband smuggled into the facility.").

■ In this case, the government adequately established that CCA's practice of monitoring and recording prisoner-visitor conversations was a reasonable means of maintaining prison security. Defendant makes no serious argument to the contrary. Rather, he focuses his arguments almost exclusively on the other end of the balance beam: his (and necessarily Lightfoot's) subjective interest in privacy. But once the government establishes that its intrusion is for a justifiable purpose of prison security, the fourth amendment question is essentially resolved in its favor. *United States v. Hearst*, 563 F.2d at 1346. "This approach is reflective of both the federal courts' 'broad hands-off attitude toward problems of prison administration,' *Procunier v. Martinez*, 416 U.S. at 404, 94 S.Ct. 1800, and traditional notions regarding official surveillance of prisoners, *Lanza v. New York*, 370 U.S. at 143, 82 S.Ct. 1218, with the concomitant reduction in reasonable prisoner expectations of privacy. *United States v. Hitchcock*, 467 F.2d at 1108." *Id.*

Based on all of the above, I find that defendant did not have a reasonable expectation of privacy either in the telephone conversations or the in-person conversations with Lightfoot and therefore the government did not violate any fourth amendment right. As a result, defen-

dant's motion to suppress on this basis should be denied.

## IV. TITLE III

Defendant argues that the recording of both his telephone conversations with Lightfoot and his in-person conversations while visiting Lightfoot violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2521 ("federal wiretap law"). For the following reasons, I find this argument meritless.

### A. TELEPHONE CONVERSATIONS

■ The federal wiretap law generally prohibits the recording of oral or wire communications without a warrant and prohibits admission of those recordings into evidence unless a specific exception to the law applies. The federal wiretap law clearly applies to prison monitoring. *United States v. Horr*, 963 F.2d 1124 (8th Cir.), *cert. denied*, 506 U.S. 848, 113 S.Ct. 143, 121 L.Ed.2d 95 (1992); *United States v. Amen*, 831 F.2d 373, 378 (2nd Cir.1987).

One exception to the federal wiretap law provides that it is not unlawful for law enforcement officials to intercept a wire, oral, or electronic communication where one of the parties to the communication has given prior consent to the interception. 18 U.S.C. § 2511(2)(c). The Senate Report specifically says in relation to § 2511(2)(c): "Consent may be expressed or implied. Surveillance devices in banks or apartment houses for institutional or personal protection would be impliedly consented to." S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Admin.News 2112, 2182.

The Eighth Circuit, along with other courts, has determined that under circumstances which exist in this case, an inmate has impliedly consented to the taping of all of his telephone conversations. In *United States v. Horr*, 963 F.2d at 1126, the court found that the defendant impliedly consented to the recordings because (1) all

prisoners are given an admission and orientation handbook which indicates that inmate telephone calls are monitored and recorded, (2) inmates are told about the recording and monitoring policy during orientation, (3) the inmate signed a form indicating he was aware of the telephone policy, and (4) there are signs posted near the telephones which warn inmates that the conversations will be monitored and that use of the telephones constitutes consent to the monitoring. The court in *United States v. Amen,*, 831 F.2d 373, 379 (2nd Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988), relied on essentially the same factors. In that case, the defendant had attended an admission and orientation lecture during which the monitoring and taping system was discussed, he had received a copy of the inmate handbook which contained a notice of the taping system, and the telephones had warnings in English and in Spanish stating as follows: "The Bureau of Prisons reserves the authority to monitor conversations on this telephone. Your use of institutional telephones constitutes consent to this monitoring. A properly placed telephone call to an attorney is not monitored."

According to the credible evidence in this case, CCA warns pretrial detainees that their telephone conversations will be recorded and may be monitored. A notice is published in the inmates' handbook which says, "Telephone conversations may be monitored and/or recorded for security reasons". There is a warning printed above the telephones, and before each call begins, a recording alerts both parties to the call that the conversation could be recorded. If using the phone after all of these warnings does not constitute implied consent, I cannot imagine what would.

I find that, at the very least,[16] Lightfoot consented to the recording of the telephone conversations because he chose to

use the telephone despite his actual knowledge, through the warnings by CCA, the notice in the handbook, the warning printed above the telephones, and the recorded warning before each telephone conversation, that the conversations were subject to monitoring and recording.

Defendant cites *Deal v. Spears,* 980 F.2d 1153, 1156 (8th Cir.1992), as authority for his assertion that knowledge of the capability of monitoring alone cannot be considered implied consent. First, in this case defendant had more than knowledge that CCA had the *capability* of monitoring the phone calls. He had knowledge that the telephone calls would be recorded for security purposes. Second, the facts of the *Deal* case are unrelated to the present case. In *Deal,* a married couple set up a recording device on the telephone in their store in order to catch an employee discussing a burglary the employers believed the employee had been involved in. Prior to actually setting up the recorder, the employers counseled the employee about her excessive use of the telephone during working hours for personal phone calls. During that counseling session, the employer remarked that he might resort to monitoring the calls or installing a pay phone in order to curtail the abuse. The employee had no other notice that her calls may be monitored or recorded. For nearly two months, the employers recorded telephone conversations between the employee and a man with whom she was having an extramarital affair at the time. The employers listened to all of the conversations in their entirety even though the conversations were mostly what the court termed "sexually provocative" and had nothing to do with the burglary. In awarding damages to the employee, the court found that the employee's use of the phone after the employer's statement that he might resort to monitoring calls or in-

---

**16.** It is reasonable to assume that defendant also impliedly consented since he was on the phone when the recording stated that the call was subject to monitoring and recording. However, since there was testimony that it was unclear whether defendant actually heard those recordings, I will defer a finding on that issue since it is clear that Lightfoot impliedly consented.

stalling a pay phone in order to curtail the employee's abuse of the phone did not amount to implied consent to have telephone calls recorded and monitored.

In that case, the employee was not warned that her telephone conversations would be recorded and may be monitored. She was not provided with a handbook which informed her that "telephone conversations may be monitored and/or recorded for security reasons". She did not read a warning printed above the telephones or hear a recording before each call began which alerted both parties to the call that the conversation could be recorded. There simply is very little similarity between the facts of this case and the case cited by defendant.

Based on all of the above, I find that Xavier Lightfoot impliedly consented to the recording of all of the telephone calls utilizing the pay phones at CCA. Therefore, defendant's motion to suppress these recordings based on a violation of the federal wiretap law should be denied.

### B. ORAL COMMUNICATIONS

■ Defendant first argues that his in-person conversations were "protected wire communications" because (1) they were conducted through an intercom system installed and serviced by a communications company acting in interstate commerce, and (2) the statute's definition of wire communications "includes 'any electronic storage' which CCA staff did use to record what was said" by defendant and Lightfoot.

I find that the in-person conversations were not wire communications within the meaning of the federal wiretap law. First, defendant fails to offer any legal support for his assertion that the in-person conversations are wire communications because they were conducted through an intercom system installed by a company acting in interstate commerce. In fact, interstate commerce is not part of the definition of wire communications in the federal wiretap law. Congressional authority to enact this statute comes from Congress' general

power under the commerce clause, and as a result, the interstate character of the communication is an "unwritten" essential element when the government is prosecuting a violation of this statute. *See United States v. Duncan*, 598 F.2d 839 (4th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *United States v. Burroughs*, 564 F.2d 1111, 1113–14 (4th Cir. 1977). In fact, it has been held that the taping of a conversation between a woman and her husband, an inmate in jail, was not a wire communication since the conversation took place on the jail's intercommunication system which did not have outside lines which could affect interstate commerce. *People v. Von Villas*, 11 Cal. App.4th 175, 15 Cal.Rptr.2d 112 (1992), *cert. denied*, 510 U.S. 838, 114 S.Ct. 118, 126 L.Ed.2d 83 (1993).

■ Second, defendant argues (again without citing any authority) that his in-person conversations with Lightfoot constitute wire communications because the definition in the statute includes "any electronic storage" and the staff of CCA electronically recorded the conversations. Defendant misinterprets the definition of wire communications—"electronic storage" is defined in the statute as any temporary, intermediate storage of a wire or electronic communication *incidental to the electronic transmission thereof*, and any storage of such communication by an electronic communication service for purposes of backup protection of such communication. 18 U.S.C. § 2510(17). In this case, there was no electronic transmission of the communication; therefore, there could be no storage of the communication incidental to the electronic transmission thereof. Examples of electronically stored communications are messages stored in a voicemail system, *United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 804, 142 L.Ed.2d 664 (1999), or in a pager system. *Brown v. Waddell*, 50 F.3d 285 (4th Cir.1995).

■ Next defendant argues that these in-person conversations were "oral communications" as defined by the statute. Section 2510(2) defines oral communication as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation".[17] The definition of oral communication was intended to reflect existing law. *Angel v. Williams*, 12 F.3d 786, 790 (8th Cir.1993) (quoting *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Therefore, the test of whether a communication is an oral communication under the federal wiretap law is whether the speaker expected his conversation to be free from interception, and whether, if he had this expectation, it was justified by the circumstances. *Id.* I find that it was not.

In *Angel v. Williams*, 12 F.3d at 790, the court noted that the tape-recording at issue took place in a public jail and between police officers and a prisoner. "These are the only material facts necessary to prove, as a matter of law, that it was not objectively reasonable for the officers to expect that their conversations would not be intercepted." *Id.*

In *United States v. Harrelson*, 754 F.2d 1153 (5th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985), the court had this to say about the expectation of privacy when conversing in a prison:

> The question presented here is thus whether [Mr. and Mrs. Harrelson] had a reasonable expectation of privacy as they spoke to each other in jail. The answer must be that they did not. It is unnecessary to consult the case law to conclude that one who expects privacy under the circumstances of prison visiting is, if not actually foolish, exceptionally naive.... [T]he precautions taken to prevent eavesdropping show the Harrelsons to have been aware of the possibili-

ty of it. That their precautions were unsuccessful does not mean that the Harrelsons believed themselves to be conversing privately; rather, it means only that they underestimated the technological resources available for eavesdropping at the Harris County Jail.

Defendant argues strenuously that he had a subjective expectation of privacy in his in-person conversations. However, defendant merely concludes, in the next-to-last sentence of this section in his motion, that the expectation of privacy was reasonable: "In sum, Mr. Peoples and Mr. Lightfoot believed that their visitation conversations were private and that belief was reasonable given the surrounding circumstances." The surrounding circumstances to which defendant refers are (1) CCA's failure to tell defendant he was being recorded, (2) CCA's failure to request a signed form from defendant acknowledging he would be recorded, (3) CCA's failure to post signs indicating that conversations would be recorded, (4) CCA's failure to place the recording device in plain view, and (5) CCA's segregating the visitation cubicals thereby "increasing privacy."

Not surprisingly, defendant cites no authority which even hints that these circumstances create an expectation of privacy which society is prepared to recognize as reasonable. In fact, defendant's assertion is contrary to the authority discussed above. Considering the facts and the case law discussed in this section as well as in section III dealing with the fourth amendment, it is clear that defendant did not have a reasonable expectation of privacy in the conversations he shared with Lightfoot in the visitors' room. As a result, the conversations that were recorded are not protected "oral communications" as that term is defined in the federal wiretap law.

17. "Despite the apparent circularity of defining a term by using the same term, it is clear that 'oral communication' is a term of art under the federal wiretap law, and the import of the term for that purpose is in the expectations of the communicator rather than in the oral nature of the communication." *Angel v. Williams*, 12 F.3d 786, 790 n. 5 (8th Cir. 1993).

Therefore, because the oral communications were neither "wire communications" nor "oral communications," the federal wiretap laws do not apply, and defendant's motion to suppress these recorded conversations on this basis should be denied.

### C. NORMAL COURSE OF DUTY

Defendant argues that the government cannot establish the CCA officers were law enforcement officers within the meaning of the federal·wiretap law or that CCA is a law enforcement agency whose employees intercept calls in the ordinary course of their business exempting them from the federal wiretap law. See 18 U.S.C. §§ 2510(5)(a) and 2510(7). The only evidence on this issue presented at the hearing was that CCA employees are not federal, state or local law enforcement officers and have no power to execute arrests. Therefore, although the "ordinary course of business" exception was not established at the hearing, I find that it is irrelevant since the telephone conversations were recorded with consent and the in-person conversations were not protected by the federal wiretap law.

### V. KANSAS CRIMINAL STATUTES

█ Finally defendant argues that recording the visits and the telephone conversations violated 21 K.S.A. § 4001, which prohibits eavesdropping, and 21 K.S.A. § 4002 which criminalizes breach of privacy. The government is correct in its assertion that violations of state law are irrelevant in federal criminal proceedings—it is federal constitutional and statutory law which apply in this case. *United States v. Hornbeck,* 118 F.3d 615, 617–18 (8th Cir.1997); *United States v. Maholy,* 1 F.3d 718, 721 (8th Cir.1993). Therefore, defendant's motion to suppress on this basis should be denied.

### VI. CREDIBILITY

In his reply, defendant points out numerous credibility issues, citing to the transcripts of the suppression. hearing. The above-stated findings of fact were reached after making credibility assess-ments. In any event, I find that the arguments made by defendant in the reply are irrelevant or fail to consider the evidence as a whole. For example, defendant argues that on June 10, 1998, Special Agent Neal obtained nine recorded calls at least two hours before CCA received a subpoena authorizing their production, yet the government argues that none of the tapes were provided without subpoenas. In order to establish this time discrepancy, defendant relies on a copy of a subpoena showing the time it was faxed. However, Warden Graf testified that "That time on the fax, though, might not be correct because we always had problems with our fax machines on what time they were delivered." (2Tr. at 36).

Defendant argues that the government "insists that the monitoring and recording of the 6/10/98 visitation 'was to determine the extent of the activities between [P]eoples, Lightfoot and the corrupt guard.' But CCA Chief of Security James Perry had no notion on June 10 that Cornelius Peoples was in any way involved in smuggling cigarettes into the institution." However, Victor Hinke testified that although defendant was not suspected of smuggling the cigarettes in, CCA officials suspected defendant had information about it. Hinke testified that Lightfoot stated to defendant that he may not be able to talk to defendant anymore because was going to be in the hole. CCA officials suspected that Lightfoot was referring to discipline from the cigarette-smuggling operation; and because defendant appeared to understand what Lightfoot was talking about, CCA officials believed that Lightfoot may provide information about the cigarette smuggling to defendant in the telephone conversations (2Tr. at 83).

I will not address each challenge listed in defendant's reply. I merely point out that all of these challenges are offered to support defendant's arguments that (1) the government's purported justification for recording the conversations is pretextual, (2) the government cannot establish that

CCA officers were law enforcement officers within the meaning of the federal wiretap law, and (3) the government cannot establish that defendants did not have a reasonable expectation of privacy in their in-person conversations.

The first two issues are irrelevant. The only relevant justification for recording the conversations is maintaining prison security which has been established. The government does not need to rely on the investigation of the cigarette-smuggling scheme, for the legality of the recordings does not rest on that fact. The mere fact that defendant had no reasonable expectation of privacy in his in-person visits is enough, and the fact that Lightfoot impliedly consented to the telephone recordings is the end of the analysis.

The course-of-duty exception is not relevant in this case, so the issue of whether corrections officers at CCA were law enforcement officers is not relevant.

Finally, the issue of an expectation of privacy cannot be resolved through the arguments of defendant—his arguments pertain to a subjective expectation of privacy, and the controlling issue here is whether the subjective expectation of privacy was objectively reasonable. I have found that it is not.

Therefore, for all of these reasons, I find that the credibility issues outlined by defendant in his reply in no way alter the findings I have made here.

## VII. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III through VI, I find that (1) defendant had no legitimate expectation of privacy in any of the conversations recorded by CCA, (2) the telephone conversations were recorded with the implied consent of Xavier Lightfoot, (3) the in-person conversations were not wire communications or oral communications within the meaning of the federal wiretap law and were therefore not subject to the provisions of that law, and (4) the Kansas criminal statutes cited by defendant do not apply to this federal case. Therefore, it is

RECOMMENDED that the court, after an independent review of the pleadings and applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections unless an extension of time for good cause is obtained.